ATTORNEY FOR APPELLANT
Mark Maynard
Decker, Lawyer & Maynard
Anderson, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Andrew A. Kobe
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 48S00-0404-DP-181

FREDRICK MICHAEL BAER,
*Appellant (Defendant below),*

v.

STATE OF INDIANA,
*Appellee (Plaintiff below).*

Direct Appeal from the Madison Superior Court, No. 48D01-0403-MR-62
The Honorable Fredrick R. Spencer, Special Judge

**May 22, 2007**

**Dickson, Justice.**

Fredrick Michael Baer was sentenced to death following his convictions for two murders and the jury's unanimous recommendation that he receive the death sentence. His direct appeal asserts the following claims of error: (1) prosecutorial misconduct; (2) erroneous admission of recorded telephone calls from jail; (3) trial court failure to comply with proper procedures in handling prospective jurors; and (4) inappropriateness of the death sentence. We affirm the judgment of the trial court.

On February 26, 2004, four-year-old Jenna Clark and her mother Cory Clark were dis-covered mortally wounded from deep cuts to the right side of their necks. Jenna was partially

decapitated. The defendant was charged with two counts of murder and various other offenses.[1] The State requested the death sentence. At trial, the jury declined to return a verdict of guilty but mentally ill, but rather found the defendant guilty on each murder charge and on the charges of robbery, theft, and attempted rape. After consideration of evidence presented in the penalty phase, the jury found the five alleged aggravating circumstances proved beyond a reasonable doubt, found the aggravating circumstances not outweighed by the mitigating circumstances, and recommended the death sentence. Appellant's App'x. at 1514-16. Thereafter, the trial court sentenced the defendant accordingly, ordering the death sentence for each count of murder.[2] The defendant presents his direct appeal to this Court, which has jurisdiction pursuant to Indiana Code § 35-50-2-9(j) and Indiana Appellate Rule 4(A)(1)(a).

## 1. Prosecutorial Misconduct

The defendant first contends that the prosecutor engaged in a general pattern of misconduct throughout both the guilt and penalty phases of the trial, "embark[ing] upon a planned attack on the defense" using "an assortment of improper and highly prejudicial comments and arguments." Appellant's Br. at 9. His appellant's brief, however, specifically identifies and focuses his appellate argument upon only one claim of prejudicial misconduct. He asserts that the prosecutor improperly:

> sought to condition the jury to consider the effect that guilty but mentally ill verdicts[3]

---

[1] The charges included: Count I, for the murder of Cory R. Clark; Count II, for the murder of Jenna Clark; Count III, for robbery of Cory Clark; Count IV, for burglary of the Clark residence; Count V, for burglary of the Douglas Brooks residence; Count VI, for theft of the Cory Clark property; Count VII, for theft of the Douglas Brooks property; Count VIII, for attempted rape; and Count IX, alleging the defendant to be a habitual offender. Prior to trial, the judge granted Baer's motion to sever Counts V and VII relating to burglary and theft of Douglas Brooks, and prior to the case being submitted to the jury at the close of evidence, the State filed an amended information deleting Count IV relating to burglary of the Clark residence. Appellant's Br. at 4.

[2] The judge sentenced Baer to death in accordance with the jury's recommendation for the two counts of murder, but sentencing on the remaining counts for robbery, theft, and attempted rape was held in abeyance "to avoid any suggestion that the Court was considering any non-death penalty aggravators during the sentencing hearing." Appellant's App'x. at 1007.

[3] Under Indiana law, when the defense of insanity is interposed, the jury must determine whether a defendant is (1) guilty, (2) not guilty, (3) not responsible by reason of insanity at the time of the crime, or (4) guilty but mentally ill at the time of the crime. Ind. Code § 35-36-2-3. If found guilty but mentally ill at

might eventually have on the execution of a death sentence due to issues which might be raised on appeal. In effect, he was urging them to use their decision at the guilt phase to insulate a death sentence from appropriate appellate review.

*Id.* at 14. The defendant contends that these are "improper considerations for the jury at the guilt phase," and that the prosecutor's behavior impaired his right "to have an impartial jury decide if he should live or die, rather than one predisposed through prosecutorial conditioning to impose death." *Id.* at 15.

The State urges that the issue is procedurally defaulted for failure to make a contemporaneous objection and, in the alternative, that there was no prosecutorial misconduct, but that if there was, it is neither fundamental error nor a basis for reversal because of the doctrine of invited error.

The defendant does not identify any objection presented at trial by his defense counsel and concedes that the claimed prosecutorial misconduct "went largely unchallenged." *Id.* at 15. He seeks to avoid procedural default, however, contending that the misconduct constitutes fundamental error.

If a defendant properly raises and preserves the issue of prosecutorial misconduct, the reviewing appellate court determines "(1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected." Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006); Booher v. State, 773 N.E.2d 814, 817 (Ind. 2002); *accord* Roach v. State, 695 N.E.2d 934, 942 (Ind. 1998); Mahla v. State, 496 N.E.2d 568, 572 (Ind. 1986). "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." Cooper, 854 N.E.2d at 835; *accord* Coleman v. State, 750 N.E.2d 370, 374 (Ind. 2001).

Six months before trial, the defendant requested permission to file a belated notice of

---

the time of the crime, a defendant is sentenced "in the same manner as a defendant found guilty of the offense." Ind. Code § 35-36-2-5(a). Such a defendant shall, however, be further evaluated at the Department of Correction and treated as is psychiatrically indicated for the illness. *See* Ind. Code § 35-36-2-5(c).

mental disease or defect. The tendered notice stated that it was being filed pursuant to Indiana Code § 35-36-2-1. When a defense under this section is asserted, the jury may find a defendant guilty, not guilty, not responsible by reason of insanity at the time of the crime, or guilty but mentally ill at the time of the crime. Ind. Code § 35-36-2-3. In the notice, however, the defendant advised his intention to assert the defense of mental disease or defect "as set out in" Indiana Code § 35-41-3-6. Appellant's App'x. at 1200. This statute provides:

> (a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.
> (b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

Ind. Code § 35-41-3-6. This provision describes the mental disease or defect that constitutes a complete defense to criminal liability, commonly referred to as the insanity defense. The trial court granted the request and the motion was filed. At the final conference between the trial court and counsel the week before trial began, the prosecutor asserted: "They have filed a motion for insanity defense. They are asking for a not guilty by reason of insanity . . . ." Trial Tr. at 338. Defense counsel did not challenge or provide any clarification of this statement.

At the beginning of the jury selection process on the first day of trial, the parties were each permitted to present a "mini opening statement," briefly summarizing the facts and issues, to "facilitate the jury panel's understanding of the case." Ind. Jury Rule 14(b). The State briefly described the alleged crime and provided the names of expected witnesses. The defense's mini opening statement primarily consisted of the following:

> I will tell you right up front we plan to be very open with you from the word go and tell you Mr. Baer committed the crimes that Mr. Cummings [the prosecutor] just indicated. He killed two people, a mother and a daughter. We plan to present evidence that Mr. Baer has suffered from serious mental illness from about the time he was thirteen years old up through his adult life. We will not be asking you to excuse him. What we will be asking for is that you find him guilty of the crimes alleged but also that he's mentally ill.

Trial Tr. at 369-70.

In the course of the prosecutor's initial questioning of the first panel of prospective ju-

4

rors,[4] he asserted that the defense would be requesting the jury to excuse the defendant's actions because of mental illness. When the defense had its first opportunity to speak with the prospective jurors, defense counsel immediately stated: "This is not an insanity defense. You are never going to hear the defense in this case say that Mike Baer ought to be excused because he was insane at the time of this crime." *Id.* at 423. Shortly thereafter, the defense began to talk with the prospective jurors about the penal consequences when a defendant is found guilty in comparison to those when a defendant is found guilty but mentally ill, and stated:

> No difference. None. No difference in where you're placed. No difference in the amount of time that you get and in this case, ladies and gentlemen, you could find Mike Baer guilty but mentally ill, deliberate and recommend the death penalty. There is no case in Indiana that says that a person who's found guilty but mentally ill is not . . .

*Id*. 431-32. The prosecutor interrupted at this point, and a bench conference ensued, in which the prosecutor asserted that the defense counsel's statements were misleading. *Id*. at 432. The defendant's attorney then continued, explaining to the prospective jurors as follows:

> Let me state it concisely. A person who is found guilty but mentally ill is treated by statute the same as a person who may be found just straight guilty. Now there is a debate in Indiana about whether or not certain justices of the Supreme Court or all the justices of the Supreme Court would ever uphold the execution of somebody who is found guilty but mentally ill. I don't know the answer to that question. I don't think anybody does, but as we stay today you know there is no difference statutorily the way you treat somebody in Indiana under the law who is found guilty but mentally ill.

*Id.* at 435. In response to one prospective juror's question whether a verdict of guilty but mentally ill might "[p]ossibly result in an appeal to the Indiana Supreme Court," defense counsel responded:

> Well, I can't answer that question. You then will deliberate again if you found that verdict and recommend whether he should get the death penalty and if you did that and then recommend the death penalty, do you think that's gonna be an issue on appeal? You're darn right it is. You're darn right it is.

*Id.* at 436-37.

When the prosecutor resumed questioning the potential jurors, he further commented on the appeals process:

---

[4] During voir dire, twelve jurors at a time were questioned by the attorneys. Trial Tr. at 370. The jurors selected from each panel of twelve then remained in the courtroom during the voir dire of succeeding panels. *Id*. at 457-59.

Now, even if . . . he's guilty or guilty but mentally ill, we're still going to be in a penalty phase, but some appellate court is going to decide at some point and the law in this state is in dispute of whether or not that can happen, whether or not a person is found guilty but mentally ill can be executed. Right now retarded people cannot be executed. Do we extend that to anybody who's guilty but mentally ill? That's an open question and the Supreme Court has not decided, so of course, if the defense wants to save this man's life, guilty but mentally ill is where they want to go. . . .

Trial Tr. at 494-95. The prosecutor explained to one prospective juror:

But I am saying . . . you know I've heard the defense attorneys twice say well, it's not letting him off the hook. Sure it is. Sure it is. Cause if he's not getting the death penalty in this case because you believe he's got some mental disease or defect, that is letting him off the hook. If you would impose the death penalty on anyone else who didn't have this condition, then it is letting him off the hook. It doesn't mean he's going to walk free. It just means he's not going to get executed or may not get executed.

*Id*. at 563. At this point, the defense counsel asked to approach the bench where he said:

I really think that saying to the jury that voting guilty but mentally ill doesn't involve the death penalty at least is far afield as I was. I was talking to them because there is law that says that . . . we don't know if it says that. . . . That's my objection.

*Id*. at 563-64. After the judge suggested an alternative way to explain the issue to the jurors, the prosecuting attorney volunteered, "I went farther than the law permitted . . . than the law states. I can clean that up." *Id*. at 564. The prosecutor then stated to the prospective jurors:

Let me be clear on what I'm telling you. It does not mean that he won't be executed if you vote for guilty but mentally ill. These lawyers will tell you they believe that it's less likely that will occur. The law in this state is not clear. We do not execute retarded people. The next battleground is people who are guilty but mentally ill and there are cases that the Supreme Court is deciding now and I suspect they want to be able to argue to the Supreme Court that it should not . . . you should not execute people who are guilty but mentally ill and that's why we're at this point in this case. Even if you find him guilty but mentally ill, we're going to have a hearing on penalty and whether he should be executed or not. But they will acknowledge that they want to be in a position to argue to the Supreme Court that people who are guilty but mentally ill should not be executed, and it's going to put them in a better position. That's why that is letting him off the hook.

*Id*. at 565. During subsequent questioning of prospective jurors, the prosecution similarly addressed the issue, for example:

But there is significance on which one of those verdicts that you decide. Guilty or guilty but mentally ill does have some consequence on how this case turns out. It may in five or ten years have some consequence on whether he's ever executed or not. I think it's going to be more difficult for the State to execute this man if he's found guilty but mentally ill. I'm not saying that to tell you that if you really think he's guilty but mentally ill, don't

6

vote that way. You should vote just the way you believe in your heart that the evidence in this case comes out. But you shouldn't cave in and got [sic] for guilty but mentally ill just because you think it really doesn't matter one way or the other.

*Id.* at 931. Shortly thereafter, in a colloquy with another prospective juror, the prosecutor stated:

[I]s there any difference between guilty but mentally ill in terms of what the potential punishment will be? . . . It's going to be harder to execute him. . . . You could still do it in our state the way the law exists now. We still have the legal authority and the law permits people who are found guilty but mentally ill to be executed. Now we don't execute people who are insane who are not responsible by reason of insanity, but there's . . . you have guilty, guilty but mentally ill and not responsible because you're insane. . . . They don't know what they did was wrong. We don't execute people like that. You have guilty but mentally ill and you have guilty and at some point in the course of this case there's going to be an argument made to our Supreme Court that people who are guilty but mentally ill should not be executed. Even though the law permits it now, there's going to be an argument and it's not a decided fact in our state whether or not that can happen or not. So a vote for guilty but mentally ill may very well mean this defendant doesn't get executed. Does that . . . do you understand that?

*Id.* at 942-43.

Because of possible confusion that might arise when a jury is asked to consider verdicts of not guilty by reason of insanity and guilty but mentally ill, trial courts are required to instruct a jury on the differing penal consequences of these verdicts if requested by the defendant. Georgopolus v. State, 735 N.E.2d 1138, 1143 (Ind. 2000). We have explained:

It is generally inappropriate . . . to give an instruction identifying specific penal consequences of a determination of guilt . . . . However, in cases involving the insanity defense, there will be increased speculation on the part of the jury on the differences in sentencing between verdicts of guilty, guilty but mentally ill and not responsible by reason of insanity. In order to dispel the speculation and to focus the jury on the issue of guilt, rather than possible punishment, an instruction explaining the consequences of each determination in a general way can be appropriate and beneficial to the accused.

Barany v. State, 658 N.E.2d 60, 65 (Ind. 1995) (quoting Smith v. State, 502 N.E.2d 485, 488 (Ind. 1987)).[5] In addition to minimizing confusion, jury instructions on post-trial procedures

---

[5] In these opinions, this Court approved the following instruction describing the verdict of guilty but mentally ill:

Whenever a defendant is found guilty but mentally ill at the time of the crime, the court shall sentence the defendant in the same manner as a defendant found guilty of the offense. At the Department of Correction, the defendant found guilty but mentally ill shall be further evaluated and treated as is psychiatrically indicated for his illness.

7

may be required to correct "an erroneous view of the law," <u>Dipert v. State</u>, 259 Ind. 260, 262, 286 N.E.2d 405, 407 (1972), or "an erroneous impression of the law," <u>Caldwell v. State</u>, 722 N.E.2d 814, 817 (Ind. 2000). In the present case, the defendant did not request any such instruction, and none was given.

It is clear that prospective jurors in this case were initially informed by both the defense and the prosecution regarding the lawyers' shared uncertainty about whether an Indiana death sentence would be upheld on appeal if it followed a verdict of guilty but mentally ill. The defendant contends that the prosecutor's comments amounted to misconduct by seeking "to condition the jury to consider the effect that guilty but mentally ill verdicts might eventually have on the execution of a death sentence due to issues which might be raised on appeal," thus impairing the defendant's right to an impartial jury and predisposing the jury against returning a verdict of guilty but mentally ill. Appellant's Br. at 14, 15. Urging that these are "improper considerations for the jury in the guilt phase," *id*. at 15, the defendant cites <u>Debose v. State</u>, 270 Ind. 675, 389 N.E.2d 272 (1979), and <u>Feggins v. State</u>, 265 Ind. 674, 359 N.E.2d 517 (1977).

Neither <u>Debose</u> nor <u>Feggins</u> involves jurors being given information regarding the possible appellate consequences of their verdict choices. But in *dicta*, these cases do recognize important judicial policy considerations.

> The danger to be avoided in such a case is that the jury, informed of the possibility of factors which could diminish the defendant's sentence, will convict the defendant of a more serious offense than that which they actually believe him to be guilty of, in order to provide a penalty which they consider more appropriate.

<u>Feggins</u>, 265 Ind. at 683, 359 N.E.2d at 523. And in <u>Debose</u>, Justice DeBruler, writing for the Court, cautioned against "condoning verdicts in which the jury might compromise, to the defendant's benefit or detriment, in order to reach a certain number of years of imprisonment." 270 Ind. at 676, 389 N.E.2d at 273-74.

Informing a jury that one of their sentencing options, here a verdict of guilty but mentally ill, may carry a special risk of appellate reversal of any resulting death sentence presents analogous concerns. Under some circumstances, standing alone, and absent proper instruction from

---

<u>Georgopolus</u>, 735 N.E.2d at 1143 n.3; <u>Barany</u>, 658 N.E.2d at 64.

the court, this information might influence a jury to disfavor a verdict of guilty but mentally ill for reasons unrelated to the evidence regarding the crime and the defendant's claim of mental illness. We therefore generally disapprove of a trial court or prosecutor gratuitously informing the jury, or prospective jurors, that varying appellate consequences may attach to the different verdict choices before the jury.

But the perceived uncertain potential appellate affect of a verdict of guilty but mentally ill was first presented to prospective jurors in this case by the defense, not the State.[6] With the acknowledged objective of seeking a verdict of guilty but mentally ill, the defense during voir dire sought to condition the jury to believe that there was no appreciable difference between that and a verdict of guilty, all the while hopefully anticipating that a significant difference may result on appeal. When challenged by the prosecutor at a bench conference for misleading the jury, the defense elected candidly to disclose its strategy to the jurors and explained its belief regarding the possible appellate affect of a verdict of guilty but mentally ill. The defendant cannot be heard on appeal to complain that the prosecutor committed misconduct by responding and presenting argument in order to resist the defense's strategy of gaining appellate advantage.

Included within the defendant's argument addressing prosecutorial misconduct is a claim that he was thereby deprived of his due process rights to have an impartial jury decide if he should live or die, rather than one predisposed through prosecutorial conditioning to impose death. In analyzing a due process claim based on alleged prosecutorial misconduct, the "touchstone" is "the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87 (1982). Even if prosecutorial misconduct is established, a new trial is not necessarily required where the conduct did not impair the jurors' ability to render an impartial verdict. *Id.* at 217, 220, 102 S.Ct. at 946, 948, 71 L.Ed.2d at 86, 88. "Due process means a jury capable and willing to decide the case solely on the evidence before it." *Id.* at 217, 102 S.Ct. at 946, 71 L.Ed.2d at 86.

---

[6] Both the defendant and the State agree that it was the defendant who first broached the subject of the post-trial appellate question regarding the effect of a guilty but mentally ill verdict. Appellant's Reply Br. at 2; Appellee's Br. at 8.

9

We are not persuaded that the lawyers' discussion of the issue impinged on the fairness or accuracy of the jury's decision-making or resulting verdict. The jurors were instructed that they were "to determine the facts in the case solely from the evidence in the case, which consists of the testimony of witnesses and exhibits received in evidence" and that "statements and arguments of counsel are not evidence." Trial Tr. 1130, 1131. They were likewise instructed: "Your sole interest is to ascertain the truth from evidence in this case." *Id.* at 2129, 2580. Substantial evidence was presented, and it focused on the facts of the alleged crime and the defendant's claim of mental illness. From our review of the record, we find it extremely unlikely that the issue of possible appellate consequences distracted or diverted the jury's attention from its task of rendering an individualized determination of guilt and sentence in this case. And although the defense and prosecution lawyers' comments expressing uncertainty about possible appellate consequences were both speculative and irrelevant to the jury's function, because of the minimal role of such extraneous comments, a reversal and new trial are not required because we find the comments neither "constitutionally irrelevant" nor "too speculative." California v. Ramos, 463 U.S. 992, 1001-02, 103 S.Ct. 3446, 3453-54, 77 L.Ed.2d 1171, 1181 (1983).

This is not a case where the State sought a death sentence by referring to potential appellate review in order to diminish a jury's sense of its responsibility. Rather, here first the defense, and then in response the State, each tried to enhance the role and responsibility of the jury for a result that might be more vulnerable to or more immune from appellate modification. But there was no diminution of the jury's sense of responsibility and care in determining the verdict.

We conclude that the prosecution did not commit misconduct in voir dire or thereafter in responding to the disclosure by the defense of its belief that a death sentence based on a verdict of guilty but mentally ill might not be upheld on appellate review.

## 2. Admission of Telephone Calls from Jail

The defendant contends that the trial court improperly admitted into evidence and played for the jury two excerpts of recorded telephone calls placed by the defendant to his sister from the Marion County jail, where the defendant was located for a portion of his pre-trial incarcera-

10

tion.  He argues that the foundation for admission of the recordings did not comport with the requirements of Packer v. State, 800 N.E.2d 574 (Ind. Ct. App. 2003), regarding the Indiana Wiretap Act ("IWA"), and that the resulting prejudice outweighed the probative value pursuant to Indiana Evidence Rule 403.

In Packer, the Court of Appeals affirmed a murder conviction over the defendant's claim of error in the admission of tapes of his telephone calls from jail to his girlfriend.  One of Packer's contentions was that the tapes were obtained without a warrant as required by the IWA, Indiana Code § 35-33.5-5-1.  The court held that the recordings did not qualify as "interceptions" under the Act, considering that Packer had, in effect, consented to the recordings because the handbook given to all jail inmates (for which Packer had signed a receipt and statement that he understood its contents) warned that their phone calls were subject to being recorded and monitored, because an announcement of that fact was made whenever an inmate made a telephone call, because Packer could have requested and received permission from the warden for an unrecorded telephone conversation, and because Packer could have refrained from making the calls. Packer, 800 N.E.2d at 582.

Characterizing Packer as if delineating prerequisite foundational requirements for admission of recorded phone calls, the defendant argues that in the present case, there was no signed acknowledgment that he received and understood the jail handbook, and that there was no procedure permitting him to request that his calls not be monitored.  Packer does not, however, purport to announce a list of foundational requirements for establishing consent under the IWA.  Rather, the court merely discussed the evidence in Packer's case in the context of finding that the trial court did not abuse its discretion in admitting the tape. *Id.* at 582-83.

In the present case, before he made the calls, the defendant received the Marion County Jail Inmate Handbook, which specifically warned that all calls from inmates were subject to being monitored and recorded.  When he placed calls as an inmate from the jail, a pre-recorded message advised both parties to the telephone call that it was from the Marion County Jail and that the call may be monitored and recorded.  There is no doubt that the defendant voluntarily acted despite his actual knowledge of the recording policy.  In proceedings outside the presence

11

of the jury, the trial court received in evidence an earlier recorded telephone call from the defendant to his sister, this one from the Madison County jail, in which the defendant read aloud to his sister a portion of a letter from his attorney stating: "Conversations over jail phone are generally taped, so you don't want to say anything over the phone which might be confidential in nature, even to your spouse." State's Ex. 63, Exhibits Vol. XXII. Despite the warning from his lawyer, the jail handbook, and the pre-recorded reminder that accompanied his telephone calls from the jail, the defendant nevertheless elected to make the calls and the statements contained in the challenged recordings. We find that the trial court did not err in overruling the defendant's objection claiming that the recorded calls lacked the foundation of consent as discussed in Packer.

Emphasizing the prejudicial content of the two recordings, the defendant argues that the the unfair prejudice far outweighed the probative value, rendering them inadmissible pursuant to Evidence Rule 403, which provides in relevant part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Evaluation of whether the probative value of an evidentiary matter is substantially outweighed by the danger of unfair prejudice "is a discretionary task best performed by the trial court." Dunlap v. State, 761 N.E.2d 837, 842 (Ind. 2002). Such rulings are reviewed for abuse of discretion. Daniels v. State, 683 N.E.2d 557, 559 (Ind. 1997). We have emphasized that the relevant inquiry is not merely whether the matter is prejudicial to the defendant's interests, but whether "it is *unfairly* prejudicial." Steward v. State, 652 N.E.2d 490, 499 (Ind. 1995).

The defendant's claim of unfair prejudice is that the excerpts played to the jury discredited his claim of mental illness by implying a conspiracy by the defense to encourage him to lie, and that they were highly misleading because his words were not heard by the jury in the context of the full telephone conversations. As to the latter claim, the complete recorded telephone conversations (which were admitted for foundation purposes although not played in their entirety to the jury) demonstrate that the portions thereof actually played to the jury were not misleading. But the content of these excerpts was definitely harmful to the defendant.

The excerpts played to the jury consisted of two passages. One included the defendant

12

requesting "before I go to this doctor's appointment," that someone come to him "so I know what to talk about" and "to brief me on what to say or whatever or anything." State's Exhibit 65, Exhibits Vol. XXII. The other played back the defendant's voice telling his sister:

> "Oh yeah, and while we're at it to boot, here let's go ahead and say you're stupid and insane so it'd make it a little bit easier. I don't think so. . . . Matter of fact, I ain't got to worry about that cause I'm getting ready to go out here to the f***ing doctor and tell this stupid son of a b**** a bunch of stupid-a** lies."

*Id.*

Because the defendant was seeking a jury verdict of guilty but mentally ill, the substance of these excerpts was obviously relevant and of high probative value, but also quite prejudicial to the defense. We are not persuaded, however, that there was anything *unfairly* prejudicial in the excerpts of the recorded telephone calls that were played to the jury. The high probative value was not outweighed by unfair resulting prejudice. We find no abuse of discretion on this issue.

### 3. Omissions in Handling Prospective Jurors

The defendant further seeks a new trial on grounds that the trial court failed to properly administer an oath to each panel of prospective jurors and that the court's introduction of the case to prospective jurors omitted certain information, as specified by Indiana Jury Rules 13 and 14. The defense acknowledges that neither party objected, but argues that the omissions "rendered a fair trial impossible." Appellant's Br. at 20.

A contemporaneous objection would have enabled the trial judge promptly to correct any omission. The failure to present a timely proper objection at trial results in procedural default preventing the issue from being raised on appeal, unless the trial court's action is found to constitute fundamental error. Booher, 773 N.E.2d at 817; Mitchell v. State, 726 N.E.2d 1228, 1235 (Ind. 2000); *see also* Harvey v. State, 546 N.E.2d 844, 846 (Ind. 1989). Fundamental error is an extremely narrow exception "and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006).

13

The defendant concedes that the Chronological Case Summary of trial court proceedings states that the potential jurors were sworn, but he asserts that the trial transcript does not include such procedure for the first two days and that on the third day, the oath was administered by the bailiff rather than the judge.

The defendant further contends that the trial judge's introduction of the case to the potential jurors covered several necessary topics but omitted information regarding the applicable standard and burden of proof, the presumption of innocence, the means by which jurors may address private concerns to the judge, the standard of juror conduct, and the rules regarding challenges. These are among the items that Jury Rule 14 requires in a trial judge's introduction of the case "[u]nless sufficiently covered by the jury orientation." Ind. Jury Rule 14. The defendant does not allege nor establish that the prospective jurors did not receive the standard jury orientation presentation recommended by the Indiana Judicial Conference. *See* Ind. Jury Rule 11.

In addition to the oaths of prospective jurors recorded in the Chronological Case Summary, the final jury panel selected was properly sworn, and the substance of the information allegedly omitted from the judge's introduction of the case to prospective juror was included in preliminary instructions given to the jury before the opening statements and presentation of evidence. We conclude that the alleged omissions of the trial court in the management of prospective jurors did not constitute fundamental error.

## 4. Appropriateness of Death Sentence

The defendant seeks our review of his death sentence for appropriateness. The Indiana General Assembly has determined that in capital jury trials, the question of whether to sentence a defendant to the death penalty is determined by the jury, after which the trial court "shall sentence the defendant accordingly." Ind. Code § 35-50-2-9(e). Article 7, Section 4, of the Indiana Constitution grants to this Court, in all criminal appeals, the power "to review and revise the sentence imposed." We have implemented this discretionary authority in all criminal cases through our adoption of Indiana Appellate Rule 7: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is in-

14

appropriate in light of the nature of the offense and the character of the offender."[7]

At about nine o'clock in the morning of February 25, 2004, in a rural Madison County residential neighborhood near Lapel High School, Cory Clark, age twenty-four, stepped onto the porch of her home as the defendant drove by. He turned his vehicle around and drove back, stopped in her driveway, and got out. Later that day, she and her four-year-old daughter Jenna were found murdered in their home, Cory in a bedroom nude from the waist down, lying in a pool of blood, her throat lacerated, and Jenna in another bedroom with spinal injuries and a severely lacerated throat that nearly decapitated her. Cory's purse containing three to four hundred dollars was missing from the house. Later that morning, after changing his clothes, the defendant returned to work. The defendant admitted committing the murders. There is no evidence that Cory and Jenna Clark were anything other than total strangers to the defendant.

The defendant, a thirty-two-year-old man at the time of the offense, was working as a traffic control worker for a construction company. He was in his third marriage. In addition to mental health testimony during both the guilt and penalty phases, considerable evidence regarding the defendant's personal background was presented in the penalty phase testimony of Mark Douglas Cunningham, Ph.D, a clinical and forensic psychologist retained by the defense to evaluate the defendant and testify as to his findings concerning "factors that may have affected Michael Baer's life." Trial Tr. at 2243. Dr. Cunningham provided extensive details regarding the defendant's early childhood, adolescence, and early adult years, explaining that during the defendant's early childhood, he had been a victim of inadequate mothering, unstable home environment, and abandonment by his biological father. During his middle years, the defendant experienced lack of parental supervision and guidance, alcohol abuse by both his mother and adoptive father, rejection by his adoptive father, and domestic abuse in the home. The defendant exhibited cognitive and emotional problems, ADHD symptoms, and school misbehavior. By this time he was abusing inhalants and other drugs. He has a record of juvenile offenses beginning

---

[7] In his concurring opinion, Chief Justice Shepard questions whether, in light of the statutory sentencing function now assigned to capital juries, appellate courts should revisit the appropriateness of a jury's particular sentence determination. Because neither the State nor the defense herein challenges the propriety of Appellate Rule 7, by which we exercise our constitutional review and revise authority, we decline consideration of this issue.

with three thefts at ages fourteen and fifteen. As an adult, he has had multiple convictions for property-related offenses. The defendant received treatment at an adolescent drug treatment center at age fourteen. Chronic marital conflicts led to the separation of his mother and his adoptive father when the defendant was about age fifteen. The defendant received drug rehabilitation treatment for periods of three and eighteen months and had several episodes of short incarceration. Dr. Cunningham estimated that between the ages of 16 and 32, the defendant was in custody or drug treatment about eighty-five percent of the time. During his late adolescent and early adult years, the defendant's cocaine and methamphetamine addiction escalated.

The aggravating circumstances alleged by the State were the murder of a child under age twelve, murder after committing another murder, murder during attempted rape, murder during robbery, and murder while on probation. The jury unanimously found all of the aggravating circumstances to have been proved beyond a reasonable doubt and that they were not outweighed by mitigating circumstances. The jury recommended a sentence of death.

The trial court entered a judgment accordingly, and made written findings, which included a description of the opinions of the mental health professionals. The defendant was examined by several health care professionals. Providing an opinion on behalf of the defense, one clinical psychiatrist, Dr. George Parker, advised that the defendant "meets the diagnostic criteria for several drug dependence diagnoses, Generalized Anxiety Disorder, and Psychosis not otherwise specified." Appellant's App'x. at 1551. Other defense experts testified that the defendant had a dysfunctional childhood and suffered as a child from ADHD. The two mental health experts appointed by the trial court agreed that the defendant understood and was able to appreciate the wrongfulness of his conduct when he committed the murders. Psychiatrist Dr. Larry Davis reported: "Fred Baer indicated that both his evil manifestation and his rational and loving persona understood the wrongfulness of his conduct. It is probable that the psychosis induced by heavy and steady methamphetamine abuse was operating at the time and was at the level of mental disease or defect. . . ." *Id.* at 1564. Dr. Davis noted that "his methamphetamine addiction in itself is an important mental illness under Axis I, diagnostically," and expressed the opinion that the defendant fits the description of "having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function." *Id.* Dr.

16

Richard L. Lawlor, a clinical psychologist, believed that the defendant "does have a mental disease or defect, namely an ongoing paranoid personality with potential to decompensate into brief psychotic episodes when he is using drugs, but even under those circumstances I do not think that his psychiatric illnesses 'grossly and demonstratively impairs his perceptions.'" *Id.* at 1581.

Tests on the defendant's blood taken about thirty-eight hours after the crime revealed only a trace amount of carboxy THC, a breakdown product of marijuana, and tested negative—"absolutely zero"—for methamphetamine and amphetamine. Trial Tr. at 1635, 1640-46.

The trial court observed that the "common thread running through every opinion is that Mr. Baer could appreciate the wrongfulness of his conduct," that he "has some mental health difficulties, but he knows what he is doing." Appellant's App'x. at 1005. The trial court found the defendant's "mental illness findings, his difficult childhood, and his in-court expressions of remorse" to be mitigating circumstances, but concluded that they were clearly outweighed by the aggravators that were "proven overwhelmingly." *Id.* at 1006.

The record does not provide evidence of any particularly strong, positive character attributes of the defendant. Giving due consideration to the trial court's decision, and in light of the nature of the offense shown by the defendant's brutal and savage slaying of a four-year-old child and her young mother, and the lack of demonstrated virtuous character in the defendant, we decline to intervene in the jury's determination that the death sentence is appropriate under the laws of Indiana for this defendant in this case.

## Conclusion

We affirm the judgment of the trial court.

Sullivan, Boehm, and Rucker, JJ., concur. Shepard, C.J., concurs with separate opinion.

17

**Shepard, Chief Justice, concurring.**

For the last several decades at least, Indiana law has assigned to judges the duty to decide sentences in criminal cases. Appellate court review of such trial court decisions has been highly deferential, but we have undertaken to review and revise sentences when persuaded that the trial court's sentence is "inappropriate."

As for death penalty and life without parole cases, the legislature has now largely shifted the sentencing decision from judges and assigned it instead to juries. I am inclined to think that we should be even less ready to set aside the sentencing judgment of jurors, and that the standard we adopted during the era of judicial sentencing should probably not apply to second-guess Indiana juries.

The parties here have not joined this question, however, and there appears no reason to reverse the jury's decision. Accordingly, I join in the Court's opinion.