**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**IAN W. THOMPSON**
**RONALD W. FRAZIER**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARQUIS WILCOX, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1209-CR-456 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Carol Orbison, Judge
Cause No. 49G22-1110-FA-73642

**June 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

Marquis Wilcox ("Wilcox") appeals, following a jury trial, his convictions on four counts of Class A felony child molesting, which were based on having sexual intercourse with a child under the age of fourteen.[1]

We affirm.

ISSUES

1.    Whether sufficient evidence supports Wilcox's convictions.

2.    Whether the trial court abused its discretion by admitting an entry from the victim's diary into evidence.

FACTS

In 2006, Wilcox started dating D.G. ("D.B.'s mother"), who had two children: a daughter, D.B., born in December 2000; and a son, Da.B. ("D.B.'s brother"), born in January 2000. D.B. and her family called Wilcox by the nickname of "Q" or "Que." (Tr. 26, 79, 114; State's Ex. 1). From August 2008 to May 2009, D.B. and her family lived in Coppertree Apartments in Marion County, and Wilcox lived with them. During 2008, D.B.'s mother worked the night shift from 6:00 p.m. to 6:00 a.m. at a prison. While D.B.'s mother was at work, Wilcox babysat for D.B. and her brother. Sometimes Wilcox would watch them at the apartment, and other times, he would take them to his mother's house to sleep.

In 2008, when D.B. was eight years old, Wilcox "started doing bad things" to D.B.—at both Wilcox's mother's house and D.B.'s apartment—when D.B.'s mother was

---

[1] Ind. Code § 35-42-4-3(a)(1).

at work. (Tr. 28). One night at Wilcox's mother's house, D.B. and her brother were sleeping in a bedroom when Wilcox came into the bedroom and did "[b]ad stuff" to D.B. (Tr. 31). Wilcox "pull[ed] down" D.B.'s "pants and under clothes" and removed his own shorts. (Tr. 32). Wilcox then "st[u]ck the part that he used the restroom with" to go "[p]ee" "in [D.B.'s] private" where she goes "[p]ee." (Tr. 32, 33). Wilcox called D.B. "baby" and moved his body "up and down[,]" which "hurt" D.B. (Tr. 34). D.B. closed her eyes and pretended to be asleep. Wilcox stopped when "[s]ome white stuff . . . came out" of "[h]is private that he pees with." (Tr. 35). Wilcox wiped the white stuff off with a towel and told D.B. not to tell anyone "or else." (Tr. 36). At trial, D.B. testified that Wilcox had sexual intercourse with her "more than once" and "[p]lenty of times" when Wilcox babysat D.B. and her brother at Wilcox's mother's house. (Tr. 37). On these other occasions, Wilcox "kept calling [her] baby" and would stop only when he would ejaculate. (Tr. 38).

One night when D.B.'s Mother was at work and Wilcox babysat D.B. and her brother at their Coppertree apartment, Wilcox went into the bedroom that eight-year-old D.B. shared with her brother. Wilcox pulled down D.B.'s pajamas and underwear and "st[u]ck the part that he pees with in the part that [she] pee[s] with." (Tr. 41). When Wilcox stuck his penis "[i]nside" D.B., it "hurt" her. (Tr. 43). Wilcox called D.B. "baby" and did not remove his penis from D.B. until the "white stuff came out[.]" (Tr. 43).

Wilcox had sexual intercourse with D.B. at the Coppertree apartment "[m]ore than once." (Tr. 44). Wilcox "call[ed] [D.B.] baby every time it happened." (Tr. 43). D.B.

3

never tried to wake up her brother because she was "scared" and "thought [Wilcox] would hurt [her]." (Tr. 44).

From May 2009 to September 2009, D.B. and her family lived in Inverness Apartments with Wilcox. At that time, D.B.'s mother worked the night shift at a hospital. On more than one occasion when they lived at Inverness and when D.B.'s mother was at work, Wilcox would go into the bedroom where D.B. and her brother slept. Wilcox would pull down D.B.'s pajamas pants and underwear, and then he would pull down his own pants and underwear. Wilcox "st[u]ck the part that he pees with in the part that [D.B.] pee[s] with[,]" which "hurt" D.B. (Tr. 50). Wilcox moved his body "up and down" and then stopped once he ejaculated. (Tr. 50).

In September 2009, D.B.'s mother and Wilcox ended their relationship. D.B. and her family moved in with her grandmother, E.B. ("D.B.'s grandmother"). D.B.'s grandmother noticed that D.B. seemed "distant" and that she was putting her dolls on top of each other. (Tr. 129). For D.B.'s ninth birthday, D.B.'s grandmother gave D.B. a diary. D.B.'s grandmother told D.B. that she could use the diary to write about her life and that no one would read it until after her death. D.B. used her diary to write about what Wilcox had done to her. For example, on March 31, 2011, D.B. wrote the following entry in her diary:

> Dear Journal,
>
> My whole life started off like this[.] [M]y mom had known this man named Que[.] [H]e would have s-e-x wi[th] me while I was sleep [sic]. I didn't know that until he had told me one day and I had called him a b-a-s-t-e-r-e-d [sic] behind his back while he was walking down the stairs but he didn't know that and he still doesn't know that . . .

4

(State's Ex. 1).  The following day, on April 1, 2011, D.B. wrote the following entry in

her diary:

> Dear Journal,
>
> I've kept all these secrets from my whole family[.]  I've been asking God
> do I need to tell them or should I wait until I die and the preacher reads this
> to them while I dead [sic].  I don't know cuz [sic] my mom can go to jail[.]
> I Love my family but I just don't if [sic] I can wait until I die or just tell
> them tommorrow [sic] so [I]'m still going to ask god if [I] should wait until
> I die or should I just tell them tommorrow [sic][.] [S]o god pleeeeease [sic]
> Help! me cuz [sic] [I] don't know pleeeeeeeease [sic] just help! me god
> please[.]  I don't know so pleeeease [sic] help! me and if you can't help me
> I understand.
>
> Love,<br>[D.]

(State's Ex. 2).

In October 2011, D.B.'s brother read D.B.'s diary and then told D.B.'s mother that

Wilcox had had sex with D.B.  Thereafter, D.B.'s mother contacted police, and D.B. had

a forensic interview at the Child Advocacy Center.  A police officer left a voicemail for

Wilcox to contact her, but the officer did not specify that it had to do with allegations

made by D.B.  After getting the voicemail, Wilcox called D.B.'s mother and asked why

the police were contacting him.

In October 2011, the State charged Wilcox with eight counts of Class A felony

child molesting based on sexual intercourse.[2]  On July 2 and 3, 2012, the trial court held a

jury trial.  During the trial, D.B. testified to the crimes as set forth above.  The State

moved to admit D.B.'s March 31, 2011 and April 1, 2011 journal entries into evidence as

---

[2] The State alleged that Counts 1-4 had occurred between December 2, 2008 and December 1, 2009 and that Counts 5-8 had occurred between December 2, 2009 and December 1, 2010.

State's Exhibit 1 and Exhibit 2, respectively. Wilcox stipulated to the admission of State's Exhibit 1 but objected to the admission of State's Exhibit 2 based on relevance and prejudice. The trial court overruled Wilcox's objection and admitted State's Exhibit 2 into evidence.

After the State rested, Wilcox moved for a directed verdict on Counts 5-8, arguing that the State had failed to show that the offenses occurred during the time period alleged in the charging information. The trial court granted Wilcox's motion and dismissed these counts. Wilcox testified on his own behalf and denied any inappropriate touching of or activity with D.B. The jury found Wilcox guilty of the four remaining counts of Class A felony child molesting (Counts 1-4).

The trial court imposed a forty (40) year sentence, with thirty (30) years executed and ten (10) years suspended, on each of Wilcox's four Class A felony child molesting convictions. The trial court ordered his sentence for Count 2 to be served consecutively to his sentence for Count 1 and that the remaining sentences be served concurrently. Thus, the trial court imposed an aggregate sixty (60) year executed sentence at the Department of Correction. Wilcox now appeals his convictions.

DECISION

1. Sufficiency

Wilcox argues that the evidence was insufficient to support his four convictions for Class A felony child molesting.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of

6

appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the [jury's verdict]. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks and citations omitted) (emphasis in original). Furthermore, "[a] molested child's uncorroborated testimony is sufficient to sustain a conviction." *Carter v. State*, 754 N.E.2d 877, 880 (Ind. 2001), *reh'g denied*, *cert. denied*. *See also Hoglund v. State*, 962 N.E.2d 1230, 1238 (Ind. 2012) ("The testimony of a sole child witness is sufficient to sustain a conviction for molestation."), *reh'g denied*.

To convict Wilcox of Class A felony child molesting as charged, the State was required to prove beyond a reasonable doubt that Wilcox, who was at least twenty-one (21) years of age, performed or submitted to sexual intercourse with D.B., a child under fourteen (14) years of age. Ind. Code § 35-42-4-3. At the time of Wilcox's offense, sexual intercourse was defined as "an act that includes penetration of the female sex organ by the male sex organ." Ind. Code § 35-41-1-26 (now codified at Ind. Code § 35-31.5-2-302 (eff. July 1, 2012)).

Wilcox does not dispute that the State presented evidence supporting the elements of the child molesting offenses. Instead, he contends that there is insufficient evidence to support his conviction because D.B.'s testimony was incredibly dubious. He also suggests that the evidence was insufficient because D.B.'s brother, who was asleep in the

7

same bedroom where Wilcox molested D.B., did not testify that Wilcox had molested D.B.

Under the incredible dubiosity rule, appellate courts may impinge upon a trier of fact's function to judge the credibility of a witness when confronted with "inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). The incredible dubiosity rule is limited to cases where a single witness presents "inherently contradictory testimony that is equivocal or coerced and there is a complete lack of circumstantial evidence of guilt." *Whedon v. State*, 765 N.E.2d 1276, 1278 (Ind. 2002). "Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." *Love*, 761 N.E.2d at 810.

In support of Wilcox's argument that D.B.'s testimony was incredibly dubious, he argues that there were inconsistencies between D.B.'s testimony and her prior deposition testimony regarding the location or apartment where the molestations occurred. Wilcox also cites to inconsistencies between D.B.'s and his own testimony regarding the occurrence of the crimes. Such inconsistencies, however, do not make D.B.'s testimony incredibly dubious. First, inconsistencies between a witness's pretrial statement and trial testimony do not make the testimony inherently contradictory. *See Corbett v. State*, 764 N.E.2d 622, 626 (Ind. 2002); *see also Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002) ("The fact that a witness gives trial testimony that contradicts earlier pre-trial statements does not necessarily render the trial testimony incredibly dubious."). Furthermore, the

8

standard for incredible dubiosity is inherent contradiction, not contradiction between witnesses' testimony. *Stephenson v. State*, 742 N.E.2d 463, 497 (Ind. 2001), *cert. denied*. As such, any inconsistencies in the testimony of multiple witnesses goes to the weight and credibility of the witnesses' testimony and do not render the testimony incredible. *Id.* "It is for the trier of fact to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve." *Ferrell v. State*, 746 N.E.2d 48, 51 (Ind. 2001). "If the testimony believed by the trier of fact is enough to support the verdict, then the reviewing court will not disturb it." *Id.*

At trial, D.B. unequivocally testified that Wilcox inserted his penis into in her vagina and had sexual intercourse with her on multiple occasions as she slept in the same bedroom as her brother. D.B. testified that she wrote about what Wilcox had done to her in her diary. D.B. also testified that her brother would not have heard what Wilcox was doing to her because he was "hard to wake" and that she usually had to tap or slap him to wake him up. (Tr. 52). D.B. also testified that she was afraid that Wilcox would hurt her if she woke her brother. D.B.'s brother corroborated that he slept in the same room with her and that he had read her diary, in which D.B. wrote about Wilcox having sex with her. Additionally, D.B.'s brother corroborated D.B.'s testimony about his ability to sleep through activity that occurred in their bedroom. D.B.'s brother testified that he was a "hard sleeper" and that his family would have to "physical[ly]" wake him by touching him. (Tr. 117).

Here, the incredible dubiosity rule is not applicable because D.B.'s trial testimony was unequivocal and was corroborated by other evidence. Wilcox's argument is nothing

9

more than an invitation for this Court to reweigh the evidence and judge the credibility of the witness, which we decline to do. *See Drane*, 867 N.E.2d at 146. The jury believed D.B.'s testimony, which was sufficient to support the guilty verdicts for the four counts of Class A felony child molesting, and we decline to impinge on the jury's credibility determinations. Because Wilcox has failed to show that D.B.'s testimony was not so inherently improbable that no reasonable trier of fact could believe it and because there is probative evidence from which the jury could have found Wilcox guilty beyond a reasonable doubt of the four counts of Class A felony child molesting, we affirm Wilcox's convictions.[3] *See, e.g.*, *Hampton v. State*, 921 N.E.2d 27, 29 (Ind. Ct. App. 2010) (holding that the testimony of the seven-year-old victim was not incredibly dubious and affirming the defendant's child molesting conviction), *reh'g denied*, *trans. denied*.

2. Admission of Evidence

Wilcox contends that the trial court abused its discretion by admitting State's Exhibit 2, an entry from D.B.'s diary. Specifically, Wilcox contends that State's Exhibit 2 should have been excluded under Indiana Evidence Rule 403 because it was more prejudicial than probative and because the journal entry contained references to God, which may have influenced the jury's credibility determination of D.B.[4]

---

[3] We decline Wilcox's invitation to adopt Judge Baker's dissenting opinion in *Leyva v. State*, 971 N.E.2d 699 (Ind. Ct. App. 2012), *trans. denied*.

[4] Wilcox also suggests that the trial court's admission of State's Exhibit 2 was erroneous based on Indiana Evidence Rule 610, which provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that, by reason of their nature, the witness's credibility is impaired or enhanced." To the extent Wilcox is raising a claim of error under Evidence Rule 610 separate from the prejudice analysis of Evidence Rule 403, we find that he has waived such argument because he did not raise a specific objection to State's Exhibit 2 based on Evidence Rule 610. "Grounds for objection must be specific and any grounds not raised in the trial court are not available on

10

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012), *reh'g denied*.

Under Evidence Rule 403, a trial court may exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." In applying the balancing test of Evidence Rule 403, the trial court has "wide latitude," and its determination is reviewed for an abuse of discretion. *Willingham v. State*, 794 N.E.2d 1110, 1116 (Ind. Ct. App. 2003). Our Indiana Supreme Court has "emphasized that the relevant inquiry is not merely whether the matter is prejudicial to the defendant's interests, but whether 'it is *unfairly* prejudicial.'" *Baer v. State*, 866 N.E.2d 752, 763 (Ind. 2007) (quoting *Steward v. State*, 652 N.E.2d 490, 499 (Ind. 1995), *reh'g denied*), *cert. denied*.

At trial, Wilcox stipulated to the admission of State's Exhibit 1, which was an entry from D.B.'s diary in which she wrote about Wilcox having sex with her. As discussed above, D.B. also provided unequivocal testimony that Wilcox had sex with her on multiple occasions. In State's Exhibit 2, D.B. did not specifically mention Wilcox by name, but she stated that she was keeping secrets that she was afraid to tell her mother for

_____

appeal." *Grace v. State*, 731 N.E.2d 442, 444 (Ind. 2000), *reh'g denied.* Thus, Wilcox's argument regarding Evidence Rule 610 is not available on appeal.

11

fear her mother would go to jail. In her diary entry, D.B. wrote about her plea to God to help her to decide whether to disclose her secrets to her family. At trial, D.B. testified that her "secrets" mentioned in her diary entry included what Wilcox had done to her. (Tr. 56). D.B. also testified that she did not tell her family about Wilcox molesting her and that they found out when her brother read her diary.

Here, Wilcox has failed to show that the admission of State's Exhibit 2 was unfairly prejudicial. Accordingly, we conclude the trial court did not abuse its discretion by admitting State's Exhibit 2 into evidence.[5]

Affirmed.

KIRSCH, J., and VAIDIK, J., concur.

---

[5] Furthermore—although we find no error—any error in the admission of the exhibit would have been harmless. Indeed, as Wilcox acknowledges, State's Exhibit 2 was merely cumulative of D.B.'s testimony regarding the occurrence of the molestation and why she did not tell anyone about it. Thus, any error in the admission of D.B.'s diary entry would be harmless. *See Crawford v. State*, 770 N.E.2d 775, 781 (Ind. 2002) (explaining that the erroneous admission of evidence that is merely cumulative of other admissible evidence is harmless error and is not grounds for reversal).