Gilbert **PECKINPAUGH**, Appellant (Defendant Below),

v.

**STATE of Indiana, Appellee** (Plaintiff Below).

No. 1081S290.

Supreme Court of Indiana.

April 14, 1983.

Emil J. Becker, Jr., David W. Lamont, Evansville, for appellant.

Linley E. Pearson, Atty. Gen., Kathleen G. Lucas, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted, after trial by jury, of Count I, Criminal Deviate Conduct, Ind.Code § 35–42–4–2(a)(1) (Burns 1979), Count II, Battery, Ind.Code § 35–42–2–1(3) (Burns 1979), and Count III, Child Molesting, Ind.Code ˙§ 35–42–4–3(b) (Burns 1979) and was sentenced to a total of thirty-one (31) years imprisonment. This direct appeal presents the following issues:

(1) Whether the trial court erred in admitting an out of court statement of one of the victims, over objection that the State was attempting to impeach its own witness.

(2) Whether the evidence is sufficient to support the convictions.[1]

\* \* \*

## ISSUE I

At trial, the alleged victim in Counts I and II acknowledged having given a prior statement to the police but testified that its contents were false. The statement was then read to the jury, over objection that the State was attempting to impeach its own witness. Defendant argues that the witness was impeached by "a single isolated event in his life", which "was not in any manner connected with his general reputation"; and therefore, in violation of *Morris v. State,* (1977) 266 Ind. 473, 484, 364 N.E.2d 132, 139, *cert. denied,* (1977) 434 U.S. 972, 98 S.Ct. 526, 54 L.Ed.2d 462, where we stated, "It is well settled, of course, that a witness

---

1. In addition to the sufficiency challenge, Defendant assigns error to the trial court's denial of his motion for a directed verdict; however, because Defendant presented evidence rather than resting upon the motion, he has waived any error with respect to its denial. *Ingram v. State,* (1981) Ind., 426 N.E.2d 18, 19.

cannot be impeached by single events, but rather such must be done by proving his general reputation."

The statement from *Morris* has been lifted out of context and does not foreclose impeachment by showing that the witness has made a prior, inconsistent statement. Unlike *Morris,* this case does not concern an attempt to impeach a witness by showing specific and unrelated prior bad acts. There was no error in the trial court's overruling Defendant's objection.

## ISSUE II

Defendant's challenges to the sufficiency of the evidence are predicated upon crediting only the in court testimony of both alleged victims, defendant's children, Robert, age 16, and Robin, age 11. Both Robert (Counts I and II) and Robin (Count III) had given sworn statements to the police, although Robert testified that he did not remember having taken an oath. In court, both witnesses testified that their prior statements were completely false and that they had lied when they made them.

■ Each statement concerns unrelated events, an alleged assault (Counts I and II) against Robert on June 12, 1980 and an act of child molesting (Count III) against Robin on June 9, 1980. The statements constituted the only evidence of the corpus delecti of the charges and the only evidence of the identity of the perpetrator. They were classic hearsay accounts, which the declarants, while acknowledging having made them, nevertheless repudiated in court. Subsequently, the declarants were subjected to cross-examination. Upon this state of the record, the statements were admissible as substantive evidence under *Patterson v. State,* (1975) 263 Ind. 55, 57–58, 324 N.E.2d 432, 484–85.

■ Acknowledgment of the statements' admissibility and the jury's capacity to utilize the statements in performing its fact finding responsibility does not end our inquiry. As was demonstrated in *Watkins v. State,* (1983) Ind., 446 N.E.2d 949 (No. 978S198), evidence admitted under the *Pat-*

*terson* exception to the hearsay rule, standing alone, is not sufficient to sustain a conviction. In *Watkins* we examined all of the evidence in the record to determine if there was direct or circumstantial evidence from which the jury could disbelieve Debra Cunningham's in court testimony and credit her out of court statements, which she had repudiated and which implicated Watkins. We found substantial evidence of probative value in the form of an excited utterance, the substance of which supported the out of court statements, and depositional testimony, which also supported the out of court statements and additionally, was taken under oath and subject to cross examination. In performing this task, we adhered to our traditional standard of review with respect to sufficiency claims, and we followed earlier decisions in which the record revealed evidence, direct or circumstantial, from which the trier of fact could reasonably credit the out of court statement(s). *Franklin v. State,* (1979) 270 Ind. 418, 420–21, 386 N.E.2d 668, 669–70; *Moten v. State,* (1978) 269 Ind. 309, 312–13, 380 N.E.2d 544, 546–47; *Rogers v. State,* (1978) 268 Ind. 370, 375–76, 375 N.E.2d 1089, 1091; *Montgomery v. State,* (1982) Ind.App., 439 N.E.2d 646, 648; *Foor v. State,* (1977) 172 Ind.App. 618, 622–23, 360 N.E.2d 1273, 1275–76; *Lloyd v. State,* (1975) 166 Ind. App. 248, 255, 335 N.E.2d 232, 237–38 (trans. denied).

We acknowledge that this is a close case. Although the victims explained the reason for their having lied—an ongoing conspiracy of some two years duration, fomented by their mother's brother, Donald, who bore a grudge against Defendant, we are, nevertheless, obligated to draw the inferences from the evidence in favor of the verdict, if such inferences may reasonably be drawn and despite any conflicts in the testimony or evidence.

Viewed in this light, the record discloses evidence from which the jury could have inferred flight. A social worker, Mrs. O'Daniel, testified that Mrs. Peckinpaugh had been made aware of a hearing upon a "Child in Need of Services" Petition which

had been filed in response to the victims' reports. Shortly before the hearing, the Peckinpaugh family moved to Colorado. Mrs. Peckinpaugh claimed that she had thought that the hearing was for the purpose of obtaining counseling for the children, that she informed Mrs. O'Daniel of the move, and that she moved in hopes that Defendant, troubled by back problems and unemployed, would be able to find a job. While Defendant freely admitted his knowledge of the CHINS hearing, he testified that he was not going to allow a court to determine the custody of his children and that he had preceded the family to Colorado, in response to a favorable determination upon a job application. Mrs. Peckinpaugh also testified that Mrs. O'Daniel had stated that there would be no criminal prosecution, a fact which Mrs. O'Daniel denied, but which Defendant and his mother confirmed. Additionally, Defendant's mother's account of what Mrs. O'Daniel had stated about how the matter would be handled parallels his wife's understanding. Although Mrs. Peckinpaugh admitted that the family moved on July 13th or 14th, 1980, she denied that either the criminal information, filed July 10, 1980, concerning which she claimed she was unaware, or the hearing on the CHINS petition had motivated the departure.

The reason for this flight could have been the victims' change of heart, evidenced by their in court testimony and corroborated by letters each had written to the appropriate authorities after the family had settled in Colorado. Robin had written two letters, the first on August 14, 1980 and the second on January 5, 1981, and Robert had written two letters, the first on July 15, 1980 and the second on January 6, 1981. Through questioning, the Prosecutor attempted to imply that the parents had been able to influence the victims, but both testified that they had originated and written the exculpating letters, none of which had mentioned the conspiracy with their Uncle Donald. Robin also testified that she had discussed the case with her mother and Robert, but that they had not told her what to say.

Additionally, Mrs. Peckinpaugh admitted that Robin had complained about Defendant's behavior to her in 1978, although the witness did not remember the details and did not, then or ever, believe the accusation. She confirmed her brother's role in the alleged conspiracy and explained that she was fighting her brother for custody of his child, Jamie, whom she did not want to live with his father, a drunk and a drug addict.

Apparently Uncle Donald, currently sought by the FBI, had convinced Robin and Robert that, in turn for their cooperation in helping to remove their father from the family, Jamie would be allowed to continue to live with them. The evidence suggests that the deal was not consummated, however, inasmuch as Mrs. Peckinpaugh testified, without refutation, that Jamie was then with Uncle Donald and that she had not seen him "since last summer (1980)." Robin also testified that Uncle Donald had made a similar proposal (threat) in 1978, which had prompted her to tell a similar lie at that time. She testified that she had used the same ploy in 1980 because it had worked so well in 1978.

At this juncture, the jury would have been left to speculate about the true nature of the conspiracy, for it might have been that Robin and Robert had agreed to tell a lie in order to keep custody of Jamie; or it might have been that Robin and Robert had agreed to reveal previously undisclosed truths about their father's behavior in order to keep custody of Jamie. The evidence upon this point and the victims' possible motives posed even more conflict.

Mrs. Peckinpaugh testified that Robert did not get along well with his father, who was a harsh disciplinarian, a role derived from a troubled childhood, and that her other children had also coaxed Robin and Robert to lie. Robin's statement, which came into evidence without objection, inferentially corroborated this testimony:

> "A.  Monday morning (June 9th, 1980.) he grounded my brother for arguing, and told him to clean up all of downstairs, * * * "

Her statement also tends to shed light upon Robert's out of court accusation:

"Q. Robin, do you know if your father has ever done anything like this to anyone else in your family?

"A. I've never seen him do anything, but my brothers have told me that he's done things to them."

Robin also stated that she had signed her statement upon threat from Mrs. O'Daniel that she and her siblings would be taken from her mother, a fact which Mrs. O'Daniel denied.

Additionally, the jury had before it testimony that in August, 1978, Defendant had voluntarily sought counseling at a mental health center. The man to whom Defendant had spoken testified that Defendant had stated that he had sexually abused all of his children but that he had provided no details. The witness knew only what Defendant had told him. This testimony is corroborated in part by Robin's statement, wherein she stated that in the summer before she entered the fifth grade, which would have been in 1978, her father had molested her in the same manner as on June 9, 1980, and by Robert's statement, wherein he stated that at the end of July, 1978 his father, quite drunk after an argument with his mother, had assaulted him in the same manner as had occurred on June 12, 1980. However, the testimony conflicts with Defendant's version, which he related after explaining that at the time, 1978, he was heavily medicated due to his back problem:

"A. That I had been told that I had molested two of my children and that I was quite concerned about it because I didn't know if it was true or not. Mr. Weber then fired at me, 'don't try to tell me that you don't remember. If you do, I can't help you and the only thing I could do is turn you over to the Welfare for prosecution.' Fearing it was in the best interest of my children and the best interest of myself, due to my state of mind at that time, I went ahead and said, 'Okay, I did it.

Treat me.' I was then entered into an eight week day treatment."

Defendant added that he had never owned the type of gun mentioned in Robert's statement or any firearm, because he was a convicted felon and further that the social workers had concluded, after an eight week counseling program, that he did not have the personality of a child molester. He also contradicted Mrs. O'Daniel, who had testified that Defendant had admitted to her that he fondled Robert and Robin in 1978 and that he had requested his son Tim to introduce him, Defendant, to Tim's girl friends for purposes of sex. Tim, however, who had suffered brain damage in an automobile accident, often fabricated stories.

Robert Peckinpaugh also testified for the defense and explained that Mrs. O'Daniel had helped him to word his statement so that it included completion of a sexual act and a threat; apparently, the oral statement he had given prior to the written statement was inadequate. On cross examination he changed the story slightly. He claimed that he had initially complained of child abuse but that it had been unsuccessful:

"A. Well, the first time, I was gonna try it on child abuse. Okay, then me and Donald didn't figure it would work. Okay? So, we talked it over again. We ... I went back in and told her that it was over sexual child abuse."

Robert's testimony was also not completely in agreement with that of his brother, Brian, who claimed that Uncle Donald had approached him about the conspiracy only in the presence of Robert and Robin. Robert testified that Donald had told him that Brian had refused the solicitations to lie.

Finally, Luther Peckinpaugh, Robert's and Robin's brother, testified that when he returned home to Evansville on or about July 1, 1980, he talked to them and that they then stated that they had lied about their father's conduct in the out of court statements.

We have related this detailed account of the evidence to illustrate that, despite the circumstantial and direct contradictions and corroborations, the jury, through sifting and weighing all of the evidence and by drawing reasonable inferences therefrom, could reasonably have concluded that Robert and Robin's out of court statements were more credible than their in court testimony. Under our standard of review, the record supports a reasonable inference that the defendant fled from the charges and intimidated the victims. Moreover, it discloses a damaging admission by the defendant with respect to his prior sexually perverted conduct and supports a reasonable inference that the victims had told the truth in their out of court statements—albeit for ulterior purposes, but regretted having done so and recanted in late summer, 1980, at which time Donald took Jamie away, notwithstanding their having revealed their father's misconduct at his bidding.

Although we reject Defendant's claim of insufficient evidence, we hasten to add that, because a criminal conviction could not be sustained if dependent upon repudiated hearsay evidence admitted under the exception of *Patterson v. State, supra* standing alone, the State must exercise caution when utilizing such evidence. When *Patterson* evidence which has been repudiated in court by the declarant is relied upon to establish any essential allegation of the charge, there must also be present substantial evidence of probative value from which the trier of fact may reasonably infer that the out of court statements are credible. *Watkins v. State, supra.* That standard was met in this case.

We find no reversible error. The judgment of the trial court is affirmed.

DeBRULER and HUNTER, JJ., concur.

GIVAN, C.J. and PIVARNIK, J., concur in result.