## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 08 2018, 7:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald C. Swanson, Jr.
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Muhammad A. Stewart, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | November 8, 2018 <br><br> Court of Appeals Case No. 18A-CR-1303 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Wendy W. Davis, Judge <br><br> Trial Court Cause No. 02D04-1708-F6-881 |

**Kirsch, Judge.**

[1] Muhammad A. Stewart ("Stewart") was convicted after a jury trial of criminal confinement[1] as a Level 6 felony and domestic battery[2] as a Level 6 felony and was ordered to serve a three-year executed sentence. Stewart raises the following issue for our review: whether the State presented sufficient evidence to support his convictions.

[2] We reverse.

## Facts and Procedural History

[3] In July 2017, J.J. and Stewart had been involved in a three-year relationship and had been living together for six or seven months. On July 25, 2017, the couple had a verbal confrontation, and as a result, J.J. left the home they shared in Fort Wayne, Allen County, Indiana to stay with a friend, Danyelle Austin ("Austin"). *Tr. Vol. II* at 122-23. After two days of staying with Austin, J.J. ran out of clean clothing and other basic necessities. Therefore, on the evening of July 27, 2017, J.J. told Austin that she was going to return to her house to collect some of her belongings. *Id*. at 123, 147. Although Austin told J.J. not to go, J.J. insisted she needed to get her belongings. *Id*. at 147. Together, the two women came up with a safety plan, where J.J. told Austin to wait approximately ten minutes, then to call her cell phone. *Id*. at 126, 148. If J.J. did not answer, Austin was instructed to immediately call the police. *Id*.

---

[1] *See* Ind. Code § 35-42-3-3(a).

[2] *See* Ind. Code § 35-42-2-1.3.

[4] J.J. arrived at the residence, entered, and began to collect clothing out of her dresser drawer when Stewart entered the bedroom and started yelling at her. *Id.* at 127. Stewart demanded to know where J.J. had been, and J.J. attempted to leave the room as he approached her. *Id.* A loud argument between J.J. and Stewart ensued, during which, J.J.'s cell phone rang, and J.J. answered the incoming phone call from Austin. *Id.* at 129. When J.J. answered the call, all that Austin could hear on J.J.'s end of the call was J.J. arguing with Stewart. *Id.* at 148. After approximately one minute and thirty seconds of listening to the argument between Stewart and J.J., Austin hung up the phone. *Id.*; *State's Ex.* 1. As soon as she hung up, however, Austin felt that she should call J.J. back because she was worried that something might happen to J.J. *Tr. Vol. II* at 149, 151-52. Austin attempted to call J.J. four more times, but each time the calls went to J.J.'s voicemail. *Id.* After the fourth unsuccessful attempt to reach J.J., Austin called 911 and alerted the police. *Id.* at 149.

[5] Fort Wayne Police Department Officers Heather Hoffmann ("Officer Hoffman") and Darrell Caudill ("Officer Caudill") were dispatched to the residence at approximately 8:30 p.m. *Id.* at 156. The officers parked their vehicle a couple of houses down from J.J.'s residence and approached the house on foot. As they got near the house, Officer Hoffmann and Officer Caudill could hear yelling coming from inside. *Id.* The screen door of the residence was closed, but the interior door was open, and the officers could see inside of the house and observed Stewart standing in the back hallway in front of the bedroom doors. *Id.* at 156, 176. Stewart saw the two officers approach

the house and met them at the front door. *Id.* at 156. Officer Caudill made contact with Stewart and asked if J.J. was there. *Id.* at 157, 176. Stewart called J.J., and she emerged from the bedroom. As soon as J.J. saw the officers, she moved quickly toward them. *Id.* at 177. Officer Caudill observed that "[s]he appeared to be in quite a bit of a hurry to get out of there." *Id.* Officer Hoffmann's observation was that J.J. seemed "very afraid . . . very nervous and frightened" and did not make eye contact with Stewart as she exited the residence. *Id.* at 157.

[6]    Officer Hoffmann walked J.J. away from the home while Officer Caudill kept Stewart inside the house. Officer Caudill observed that Stewart was also very nervous, breathing rapidly, sweating heavily, and shaking. *Id.* at 177. J.J. told Officer Hoffmann that, while she was attempting to remove some of her belongings from the house, Stewart confronted her, pushed her down onto the bed, placed his hand on her neck, balled up his other fist, and told her that she was not leaving and that he would hit her again if she tried to leave. *Id.* at 159. J.J. stated to Officer Hoffman that, as she struggled to get free, Stewart slapped her across the left side of her face. *Id.* J.J. continued to struggle, and Stewart grabbed J.J.'s hair weave, which was sewn into her hair, and ripped it out. *Id.* at 159, 173. Stewart then got up and stood in the doorway of the bedroom, refusing to let J.J. leave. *Id.* at 155, 162-63. The incident occurred less than a minute before Officer Hoffmann and Officer Caudill arrived at the scene. *Id.* at 158. As a result, J.J. told Officer Hoffmann that her back was hurting, that the

left side of her face hurt, and that she felt pain along her scalp, but she refused medical treatment. *Id*. at 163, 170.

[7] After speaking with J.J., Officer Hoffmann signaled to Officer Caudill to take Stewart into custody. *Id*. at 157. Officer Caudill handcuffed Stewart and placed him in the back of the parked police car. After being arrested, Stewart began shouting that J.J. was "acting." *Id*. at 178. Officer Caudill, who was wearing a microphone on his lapel, then approached Officer Hoffmann and J.J. to take pictures of J.J.'s injuries. He photographed J.J.'s face and hair and of J.J.'s hair weave, which had been retrieved from the bedroom and placed on the back of a nearby vehicle. *Id*. at 161-162; *State's Exs*. 2-7. While Officer Caudill was taking these photographs, J.J. told him that Stewart "just grabbed me by the neck." *State's Ex*. 9 at 00:00:21-00:00:22. She also stated that Stewart had told her "you aren't going nowhere" and that he had pushed her down on the bed and told her that he would not allow her to leave their house again. *Id*. at 00:0021-00:00:22, 00:01:59-00:02:02. J.J. agreed to talk to a detective and, during a phone call with the detective approximately one hour later, recounted the same allegations against Stewart. *Tr. Vol. II* at 189, 191.

[8] The State charged Stewart with Level 6 felony criminal confinement and Level 6 felony domestic battery. The trial court issued a no contact order prohibiting Stewart from contacting J.J. *Appellant's App. Vol. 2* at 4. However, sometime after Stewart was released from jail, Austin saw Stewart and J.J. together. *Tr. Vol. II* at 153. After Stewart's release from jail, J.J. stopped talking to Austin altogether. *Id*. at 153-54.

[9] A jury trial was conducted on April 10, 2018, and during her testimony, J.J. recanted the allegations she had made against Stewart on July 27, 2017. *Id*. at 128, 130-32. At trial, she claimed that she had tried to push Stewart out of the way while the two were arguing, causing him to stumble and strike her face with his hand as he tried to catch himself. *Id*. at 128. J.J. denied that he intentionally slapped her and maintained that her statements to Officer Hoffman and Officer Caudill were "exaggerated" and that she did not tell the detective that Stewart battered her and if his report said so, he was "mistaken." *Id*. at 128, 140, 143. She also stated that she wanted to reconcile with Stewart after the trial. *Id*. at 136-37. At the conclusion of the trial, the jury found Stewart guilty as charged, and he was sentenced to an aggregate sentence of three years executed. Stewart now appeals.

## Discussion and Decision

[10] The deferential standard of review for sufficiency claims is well settled. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*. We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from this evidence. *Fuentes v. State*, 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied*. We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State*, 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied*. We will not disturb the verdict if there is substantial evidence of probative value to support it. *Fuentes*, 10 N.E.3d at 75. We will

affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Delagrange v. State*, 5 N.E.3d 354, 356 (Ind. 2014). A conviction can be sustained on only the uncorroborated testimony of a single witness, even when that witness is the victim. *Dalton v. State*, 56 N.E.3d 644, 648 (Ind. Ct. App. 2016), *trans. denied*.

[11] Stewart argues that the State failed to present sufficient evidence to support his convictions for Level 6 felony criminal confinement and Level 6 felony domestic battery. Specifically, he contends that his convictions were not supported by sufficient evidence because they were based on repudiated out-of-court statements. Stewart asserts that his convictions were solely based on J.J.'s statements made to the police at the scene, which she later recanted, and that no other substantial evidence of probative value was presented from which the jury could infer that the prior, recanted statement was credible.

[12] In order to find Stewart guilty of Level 6 felony domestic battery, the State was required to prove beyond a reasonable doubt that Stewart knowingly or intentionally touched J.J., a member of his household, in a rude, insolent, or angry manner and that Stewart had a prior conviction for battery. Ind. Code § 35-42-2-1.3 (a)(1), (b)(1)(A). To find him guilty of Level 6 felony criminal confinement, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally confined J.J. without her consent. Ind. Code § 35-42-3-3(a). It is well settled that a conviction may not be predicated upon a repudiated out-of-court statement unless there is substantial evidence of probative value from which the trier of fact could infer the repudiated statement

is credible. *Peckinpaugh v. State,* 447 N.E.2d 576, 581 (Ind. 1983). It is also clear that a repudiated statement cannot be rendered credible by another repudiated statement, or by the repudiated statement itself. *Laswell v. State*, 494 N.E.2d 981, 982 (Ind. Ct. App. 1986). Rather, the corroborative evidence must be evidence independent of the statement itself. *Id.*

[13] Here, no such independent corroborative evidence was presented. J.J. repudiated her statements to police and denied making them when she testified under oath at trial, and there was no independent evidence of a battery or of confinement. There were no eyewitnesses to the altercation between Stewart and J.J., and J.J. suffered no documented injuries as a result of the alleged battery. Stewart did not admit to any wrongdoing or attempt to flee when the officers arrived at the residence. Other than the testimony of the officers regarding J.J.'s recanted statements, there is nothing in the record that corroborates J.J.'s out-of-court statements or that makes them more credible than her testimony given under oath at trial. We, therefore, conclude that, because no substantial evidence of probative value was presented from which the jury could infer J.J.'s recanted statements were credible, insufficient evidence was presented to support Stewart's convictions. We reverse his convictions for Level 6 felony criminal confinement and Level 6 felony domestic battery.

[14] Reversed.

Vaidik, C.J., and Riley, J., concur.