

**FILED**

Feb 12 2019, 8:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nicholas F. Wallace
Deputy Public Defender
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cody J. Chambless,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 12, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1384<br><br>Appeal from the<br>Allen Superior Court<br><br>The Honorable<br>John F. Surbeck, Jr., Judge<br><br>Trial Court Cause No.<br>02D06-1801-F5-1 |

**Kirsch, Judge.**

[1] Cody J. Chambless ("Chambless") appeals his convictions for Level 5 felony domestic battery,[1] Level 6 felony domestic battery,[2] and Level 6 felony strangulation[3] arising from the assault of his girlfriend ("K.B.") He raises three evidentiary issues and one sufficiency of evidence issue, which we restate as follows:

> I. Regarding admission of evidence, whether the trial court: (A) committed fundamental error in admitting K.B.'s 911 phone call into evidence; (B) abused its discretion in admitting K.B.'s statement to the medic who treated her that Chambless was her attacker; and (C) abused its discretion in admitting the jail phone conversation between Chambless and K.B. in which K.B. accused Chambless of choking her; and

> II. Whether sufficient evidence supports Chambless's convictions.

We affirm.

## Facts and Procedural History

[2] Chambless was K.B.'s boyfriend. *Tr. Vol. 1* at 24. On Christmas day of 2017, K.B. was living with Chambless in an Allen County apartment. *Id.* at 24-25. K.B. was working ninety-six hours per pay period as a cook at the Pilot truck stop while Chambless was unemployed. *Id.* at 25. K.B. worked Christmas Eve

---

[1] *See* Ind. Code § 35-42-2-1.3(c).

[2] *See* Ind. Code § 35-42-2-1.3(b).

[3] *See* Ind. Code § 35-42-2-9.

from 11:00 p.m. to 7:00 a.m. Christmas morning. *Id.* at 26. She arrived home at about 7:25 or 7:30 a.m.; Chambless was at home watching television and drinking. *Id.* K.B. put on her pajamas and rested for a few hours, and when she awoke, Chambless was still drinking. *Id.*

[3] K.B. was tired of Chambless's drinking, which she described as an everyday occurrence: "every time I come home he's drinking, every time I wake up before work, he's drinking . . . . So he was drinking and that really upset me." *Id.* at 26-27. They argued and fought; K.B. threatened to leave Chambless, warning him that it was "his drinking or me." *Id.* at 27. During the fight, Chambless punched holes in the wall and broke a door on an upstairs bathroom. *Id.* at 27-28; *State's Ex.* 6, 8. The fight occurred around 10:10 a.m. *Id*. at 52.

[4] K.B. ran from the apartment to a BP gas station two or three blocks away. *Tr. Vol. 1* at 28-29, 48. Even though it was cold outside, K.B., in her haste, did not don a winter coat or boots, instead wearing only a shirt, pants, and regular shoes. *Id*. 28-29, 53. When she arrived at the BP station, K.B. told the employees about the fight, and they called 911 for her. *Id.* at 28-29. During the call, K.B. told the police that Chambless had beaten her. *Id.* at 28. She also said that she was having trouble breathing. *Id.* at 30. Her breathing sounded labored and wheezy. *See State's Ex.* 1.

[5] Medics, including Marah Bradbury ("Medic Bradbury"), responded to the 911 call and tended to K.B. at the gas station by checking her blood pressure and

pulse. *Tr. Vol. 1* at 30, 47. K.B. told Medic Bradbury that Chambless had assaulted her. *Id.* at 30, 48. Offering more details, K.B. said that Chambless slapped her in the face and strangled her with his hands, making her feel like she would faint. *Id.* at 48. K.B. also told Medic Bradbury that she escaped Chambless "just in time" and ran to the gas station to call for help. *Id.* Medic Bradbury observed abrasions to each side of K.B.'s jaw and a bruise on the bottom of K.B.'s neck. *Id.* at 47.

[6] Police officers, including Officer Robert Geiger of the Fort Wayne Police Department ("Officer Geiger"), also responded to the 911 call, arriving at the BP station around 10:30 a.m. *Id.* at 36, 51-52. K.B. was still upset and crying when she spoke with Officer Geiger; she told him that she was still afraid. *Id.* at 37, 51. K.B. told the officers that Chambless had strangled her. *Id.* at 36. Officer Geiger observed redness around K.B.'s neck. *Id.* at 53. Later that day, K.B. spoke to Detective Michael Epps of the Fort Wayne Police Department ("Detective Epps"), and likewise told him that Chambless had choked her. *Id.* at 40, 57. Detective Epps observed a scratch on K.B.'s neck and swelling on her left cheek. *Id.* at 57.

[7] The State charged Chambless with three counts: Count I, Level 5 felony domestic battery with a prior domestic battery conviction where K.B. was the victim; Count II, Level 6 felony domestic battery with a prior domestic battery conviction where someone other than K.B. was the victim; and Count III, Level 6 felony strangulation. *Appellant's App. Vol. II* at 14-18.

[8] Chambless was initially incarcerated at the Allen County Jail. Upon placement there, inmates such as Chambless receive a packet that tells them that the jail monitors inmate phone calls. *Tr. Vol. 1* at 61-62. The same information is posted in every cell block. *Id.* at 62. When an inmate uses a jail phone, an audio recording reminds the inmate that the phone call is monitored. *Id.* On December 26, 2017, while Chambless was in jail, he and K.B. spoke on the phone about their fight from the previous night. *Id.* at 65, 70; *State's Ex.* 11. In their conversation, K.B. told Chambless: "you strangled the fuck" out of me. *Tr. Vol. 1* at 70; *State's Ex.* 11.

[9] At Chambless's jury trial, the State tendered, and the trial court admitted, an audio recording of K.B.'s 911 call without objection from Chambless. *Tr. Vol. 1* at 22-23. The trial court also admitted, this time over Chambless's hearsay objection, the audio recording of Chambless's phone call from jail to K.B. *Id*. at 63-65; 70; *State's Ex.* 11. The State tendered Exhibit 11 through Corporal Jeff Kroemer of the Allen County Sheriff's Department, who operated the phone system at the Allen County Jail, and who listened to the conversation between Chambless and K.B. The exhibit was published to the jury. *Tr. Vol. 1* at 66.

[10] The State also elicited testimony, over Chambless's objection, from Medic Bradbury, who recounted K.B.'s statements to Medic Bradbury that Chambless had assaulted K.B. by striking her and choking her and that she had escaped "just in time" to run to the gas station for help. *Id.* at 30, 40-41, 46-49.

[11]     When K.B. testified, she recanted her allegation that Chambless had assaulted her. She said Chambless had not choked her but that she had choked herself, explaining:

> [K.B.]: Because I was just tired of everything, I'm tired of the stress and going through everything. I was to the point where I was just ready to end my life. I lost my daughter six (6) years ago, towards, four (4) days before Christmas, and living with that, it hurts. I've never gotten help for it. I don't know if I ever will.
>
> . . . .
>
> [Defense counsel]: Okay. We just heard on the 911 call, as [the deputy prosecutor] said, that you told them my boyfriend assaulted me. Why would you tell them that?
>
> [K.B.]: Cause I was just tired of everything, the stress, everything going on at home, him drinking, him not working. I'm the only one paying the bills. Yeah, he goes on Craigslist and sells his stuff, trade his stuff to help out, yeah. It helps out with the food and everything, and cigarettes, but it's – the bigger picture I'm looking at . . . bills, somewhere for us to live, and a roof over our head, and it's just all the stress and everything. I just couldn't take it no more, and I didn't mean to do that for him. I apologize, and it's not right.
>
> . . . .
>
> [Defense counsel]: How were you going to get him out of the house?

[K.B.]:  Make up lies just to get him out cause I know you would have to evict him cause he established residency there, he gets mail there.  So the only way is the eviction and I wasn't going to go through another stressor on top of another stressor, the eviction process, and then going to court for the eviction.  It's just – the only thing I knew is get him to go to jail, is the only thing I knew.

*Id.* at 31-33.

[12]  The jury found Chambless guilty as charged.  *Id.* at 86-89.  At sentencing, the trial court merged Counts II and III into Count I and sentenced Chambless to five years, with three years executed and two years suspended to probation.  *Appellant's App. Vol. II* at 8-9, 93.  Chambless now appeals.

## Discussion and Decision

[13]  Chambless raises three evidentiary issues and one sufficiency issue.  Regarding the former, he argues that the trial court should not have admitted the following three pieces of evidence, all out-of-court statements:  1) the recording of K.B.'s 911 phone call; 2) the part of Medic Bradbury's testimony that recounted K.B.'s statement that Chambless was her attacker; and 3) the recording of the jail phone call.  Because he did not object at trial to the admission of the 911 call, Chambless tries to resurrect that claim by alleging fundamental error.  Regarding the latter issue, he argues that the State failed to present sufficient evidence to support his convictions because the State's only evidence was inadmissible hearsay.  He notes that, at trial, K.B. recanted her allegations.

Thus, he claims that the guilty verdict is "completely against logic and sound reasoning." *Appellant's Br.* at 19.

## I. Evidentiary Issues

[14] As to Chambless's evidentiary claims, we note that a trial court has broad discretion in ruling on the admissibility of evidence, and we disturb those rulings only upon an abuse of that discretion. *Carr v. State*, 106 N.E.3d 546, 552 (Ind. Ct. App. 2018), *trans. denied*. An abuse occurs only where the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Palmer v. State*, 704 N.E.2d 124, 127 (Ind. 1999). There is a strong presumption that the trial court properly exercised its discretion. *Warner v. State*, 773 N.E.2d 239, 247 (Ind. 2002). In determining the admissibility of evidence, we will only consider evidence that favors the trial court's ruling and unrefuted evidence that favors a defendant. *Sallee v. State*, 777 N.E.2d 1204, 1210 (Ind. Ct. App. 2002). We will not reverse a trial court's evidentiary ruling if we may sustain it on any ground. *See Crawford v. State*, 770 N.E.2d 775, 780 (Ind. 2002).

[15] Hearsay is "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not admissible except as provided by law or by other court rules. Ind. Evidence Rule 802.

### A. K.B.'s Statements in 911 Phone Call

[16] Chambless argues that it was fundamental error to admit the 911 call, claiming, *inter alia*, that K.B.'s statements in the call were hearsay, which were not

admissible as excited utterances because the State did not pose questions to K.B. as to whether she was under stress when she made the call or establish a time frame between the time of the fight and the 911 call. "Thus, no proper foundation was laid for an excited utterance exception to the prohibition against hearsay." *Appellant's Br.* at 14. The fundamental error exception is extremely narrow and encompasses only errors so blatant that the trial judge should have acted independently to correct the situation. *See Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018). Chambless concedes that to prevail on a claim of fundamental error, he must show that the admission of the 911 call made "a fair trial impossible." *See id.*

[17] As Chambless acknowledges, a trial court may admit hearsay that qualifies under the excited utterance exception. *See* Ind. Evidence Rule 803(2). An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement that it caused." *Id.* The rationale behind admitting excited utterances is that startling events and absence of opportunity for reflection vest the statements with reliability and reduce the likelihood of falsification. 13 Robert Lowell Miller Jr., *Indiana Practice*: Indiana Evidence § 803.102 (3d ed. 2007). Whether a statement constitutes an excited utterance is a factual determination subject to a clearly erroneous standard of review. *Davenport v. State*, 749 N.E.2d 1144, 1148 (Ind. 2001).

[18] To use this exception, the proponent of the evidence must establish three foundations: (1) a startling event; (2) a statement made while the declarant was

under the stress of excitement caused by the event; and (3) that the statement relates to the event. *Id.* We do not apply this test mechanically but consider the particularities of each case. *Young v. State*, 980 N.E.2d 412, 421 (Ind. Ct. App. 2012). "The heart of the inquiry is whether the declarant was incapable of thoughtful reflection." *Id.* "A declaration does not lack spontaneity simply because it was an answer to a question. Whether given in response to a question or not, the statement must be unrehearsed and made while still under the stress of excitement from the startling event." *Yamobi v. State*, 672 N.E.2d 1344, 1346 (Ind. 1996).

[19]   The event and utterance need not be contemporaneous, though lapse of time is a factor to consider when deciding if the statement was spontaneous and unrehearsed. *Holmes v. State*, 480 N.E.2d 916, 918 (Ind. 1985). The longer the time between an event and an utterance, the greater the likelihood that the statement is a narrative of past events instead of an excited utterance. *See Lewis v. State*, 554 N.E.2d 1133, 1136 (Ind. 1990) (discussing *res gestae* exception, "the possibility of shrewd and self-calculated answer" was not precluded but was in fact facilitated by the passage of time). However, the greater the stress caused by the event, the longer the effects of the stress can endure. For instance, in *Yamobi*, 672 N.E.2d at 1346-48, our Supreme Court held that a statement as long as one hour after a shooting was admissible as an excited utterance. In *Newbill v. State*, 884 N.E.2d 383, 397 (Ind. Ct. App. 2008), *trans. denied*, a rape victim's 911 phone call at least four hours after the rape was admissible under the excited utterance exception.

[20] Chambless's arguments that the State did not ask K.B. on direct exam whether she was under stress when she made the call or establish a time frame between the fight and the call are unavailing. The testimony at trial clearly showed the contrary. K.B. had been beaten and strangled, clearly a startling event, one that made her run from the apartment "just in time," not taking the time to wear a coat and winter boots despite the cold weather. *See Tr. Vol 1* at 28-29, 48, 53. Further, the fact that Chambless, during the altercation, punched holes in the wall and broke a door to an upstairs bathroom accentuated the emotional intensity of the event. *See id.* at 27-28; *State's Ex.* 8. K.B. had trouble breathing during her 911 call further illustrating her distressed state of mind. *Tr. Vol. 1* at 30. Because the fight occurred at 10:10 a.m. and K.B. called 911 no later than 10:28 a.m., her statement to the 911 operator occurred a short time after she was attacked, not giving her time for thoughtful reflection. *See id.* at 36, 51-52; *see also Yamobi*, 672 N.E.2d at 1346 (statement one hour after shooting was an excited utterance) and *Newbill*, 884 N.E.2d at 397 (rape victim's 911 phone call at least four hours after incident was admissible as an excited utterance).

[21] These facts easily established the foundational requirements for excited utterances: (1) a startling event; (2) a statement made under the stress of the event; and (3) a statement that relates to the event. *Davenport*, 749 N.E.2d at 1144. They also establish that K.B.'s statements during the 911 call were unrehearsed and made while still under the stress from the fight. *See Yamobi*, 672 N.E.2d at 1346. K.B.'s statements during the 911 call were admissible as

excited utterances, and there was no error, fundamental or otherwise, in allowing the jury to hear this evidence.

### B. K.B.'s Statements to Medic Bradbury

[22] Chambless argues that Medic Bradbury's statement that recounted K.B.'s allegation to Medic Bradbury that Chambless had assaulted her was inadmissible hearsay. Chambless acknowledges that statements made pursuant to medical treatment or diagnosis are admissible under Indiana Rule of Evidence 803(4), but he claims that statements about the identity of the perpetrator who caused the injuries are not admissible under this exception.[4]

[23] Indiana Evidence Rule 803(4) provides that statements for purposes of medical diagnosis or treatment are admissible if the statement:

> (A) is made by a person seeking medical diagnosis or treatment;
>
> (B) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and
>
> (C) describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause.

---

[4] Chambless has waived this claim because while he made a general objection at trial on hearsay grounds at the outset of Medic Bradbury's testimony, he failed to object on these more specific grounds when Medic Bradbury testified that K.B. told her that Chambless was her attacker. *Tr. Vol 1* at 48. A party may not add to or change his grounds for objections on appeal. *Treadway v. State*, 924 N.E.2d 621, 631 (Ind. 2010). Any ground not raised at trial is not available on appeal. *Id.* Nonetheless, we will review this claim on the merits.

*Id.* This hearsay exception is "based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely that the declarant would mislead the medical personnel person she wants to treat her." *Miles v. State*, 777 N.E.2d 767, 771 (Ind. Ct. App. 2002) (citing *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)).

[24] Such statements usually do not include statements that identify the perpetrator because the identity of the perpetrator is usually not necessary to provide effective medical care. *Perry v. State*, 956 N.E.2d 41, 49 (Ind. Ct. App. 2011); *Nash v. State*, 754 N.E.2d 1021, 1024-25 (Ind. Ct. App. 2001). However, where the identity of the perpetrator is relevant to appropriate diagnosis and treatment, we have upheld the admission of statements that identify a perpetrator. In *Nash,* for instance, we found that a rape victim's statement to an emergency room nurse that her estranged husband had raped her was relevant to her treatment because part of the nurse's job was to determine if a person was a victim of abuse and, if so, determining the identity of perpetrator would help the nurse recommend appropriate counseling resources and how to advise the victim about avoiding further domestic abuse. *Id.* at 1025. *Nash* also discussed how other jurisdictions had used this rationale to admit children's statements to medical providers that identified the perpetrator of abuse.

> The reason for allowing such testimony is "that knowledge of the perpetrator is important to the treatment of psychological injuries that may relate to the identity of the perpetrator and to the removal of the child from the abuser's custody or control." 2 John W. Strong, McCormick on Evidence § 278 at n.9. . . . [T]he identity of the child abuser is not only pertinent to treating

the child's emotional and psychological injuries, but also necessary to prevent a child from being returned to an abusive environment. Accordingly, where a child abuser is a member of the family or household, this person's identity is particularly pertinent to the medical personnel's recommendation with respect to treatment.

*Id*. at 1024-25.

[25] *United States v. Joe*, 8 F.3d 1488, 1494-95 (10th Cir. 1993) discussed this rationale in rape cases:

> The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household. In the domestic sexual abuse case, for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere. In short, the domestic sexual abuser's identity is admissible under Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes "reasonably pertinent" to the victim's proper treatment.

*See also Perry*, 956 N.E.2d at 49.

[26] The same reasoning applies here. K.B.'s identification of Chambless, her live-in boyfriend, as her attacker was relevant to Medic Bradbury's diagnosis and treatment of K.B. As with any medical professional, Medic Bradbury would need to tailor her diagnosis and treatment to the particularities of each case. Her treatment and recommendations for a victim of domestic abuse would undoubtedly differ, in some regards, from the treatment and recommendations

she would give a victim who was assaulted by a stranger. *See Joe*, 8 F.3d at 1494-95. Special therapy or counseling is often appropriate for victims of domestic violence. *See Nash*, 754 N.E.2d at 1025. Thus, learning from K.B. that Chambless was her attacker would help Medic Bradbury assess what kind of counseling services would best suit K.B. and could result in K.B. being directed to one of the local domestic violence shelters.

[27] Thus, while the identification of an attacker in a statement to a medical professional is normally not admissible under Indiana Evidence Rule 803(4), K.B.'s statement here identifying Chambless as her attacker was admissible to aid Medic Bradbury in her diagnosis and treatment of K.B. Thus, the trial court did not abuse its discretion in admitting this statement.[5]

### C. K.B.'s Statements During Jail Phone Call

[28] Chambless contends that the trial court abused its discretion in admitting into evidence a recording of the jail phone call conversation between him and K.B., particularly K.B.'s statement to Chambless during that conversation that "you strangled the fuck out of me". *Tr. Vol. 1* at 70; *State's Ex. 11*. Chambless acknowledges that his own statements during the conversation were admissible

---

[5] K.B.'s statement to Medic Bradbury was also arguably admissible under the exited utterance exception. While the record does not explicitly state that K.B. spoke to Medic Bradbury around the same time she made her 911 call, the most reasonable interpretation of the record suggests that both conversations occurred around the same time. Because K.B. was clearly agitated and stressed when she made her 911 call, she was likely in the same state of mind when she told Medic Bradbury that Chambless was the person who attacked her. *See Tr. Vol 1* at 37, 51.

as statements against interest but claims this reason does not justify admission of K.B.'s statements during that conversation.

[29] Chambless fails to recognize that recordings of telephone calls made from jail are admissible when the defendant discusses the crime for which he is incarcerated. *Baer v. State,* 866 N.E.2d 752, 762 (Ind. 2007); *King v. State*, 985 N.E.2d 755, 759 (Ind. Ct. App. 2013). In *Baer*, the defendant was advised that jail phone conversations were recorded. *Id.*

[30] The same is true here. Inmates at the Allen County Jail receive a packet that provides information about the jail's policies, including the policy that allows jail personnel to monitor inmate phone calls. *Tr. Vol. 1* at 61-62. The same information is posted in every cell block, and when an inmate uses a jail phone, an audio recording reminds the inmate about the policy. *Id.* Thus, Chambless was warned that his phone conversations, including his conversation with K.B., would be recorded. *Id.* Nonetheless, he chose, at his own risk, to discuss his crime over the phone with K.B. Thus, the trial court did not abuse its discretion in admitting the jail phone conversation between Chambless and K.B. *See Baer*, 866 N.E.2d at 762.[6]

---

[6] Chambless's final argument regarding evidence admitted at trial is that even if the admission of each statement was, standing alone, harmless error, the cumulative effect of the erroneous rulings resulted in fundamental error. Because we find no error regarding any of these evidentiary issues, this argument has no merit.

# II. Sufficiency of Evidence

[31] Chambless claims the State failed to present sufficient evidence for his convictions because they rested solely on the inadmissible hearsay statements from the 911 call, the testimony of Medic Bradbury, and the jail phone conversation. Thus, Chambless argues, the only evidence addressing his guilt was K.B.'s recantation at trial that Chambless had assaulted her. Therefore, he contends we should invoke the incredible dubiosity rule to impinge on what is usually the jury's responsibility to judge witness credibility. *See Moore v. State*, 27 N.E.3d 749, 754 (Ind. 2015).

[32] When reviewing the sufficiency of evidence, we do not reweigh the evidence or judge the credibility of the witnesses, and it is the jury's role to weigh conflicting evidence. *Alkhalidi v. State*, 753 N.E.2d 625, 627 (Ind. 2001). We consider only the probative evidence and reasonable inferences supporting the verdict. *Id.* We will affirm the trial court if the probative evidence and reasonable inferences drawn therefrom could have allowed the jury to find a defendant guilty beyond a reasonable doubt. *Id.* A conviction can be sustained on the uncorroborated testimony of a single witness, even when that witness is the victim. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). We will not second guess a jury's assessment of witness credibility unless the witness's testimony is inherently improbable. *See Holden v. State*, 815 N.E.2d 1049, 1053 (Ind. Ct. App. 2004), *trans. denied*.

[33] Here, we reject Chambless's argument that the State failed to present sufficient evidence for his convictions. It is not true that K.B.'s convictions were supported only by her out-of-court statements. Independent evidence of the assault came from: (1) Medic Bradbury's observation of abrasions to each side of K.B.'s jaw and a bruise on the bottom of K.B.'s neck; (2) Officer Geiger's observations of redness around K.B.'s neck; and (3) Detective Epps's observations of a scratch on K.B.'s neck and swelling on her left cheek. *Tr. Vol. 1* at 47, 53, 57.

[34] This independent evidence is especially important because where, as here, a victim recants, a conviction may not rest on a repudiated out-of-court statement unless there is substantial independent evidence of probative value from which the jury could find that the repudiated statement is credible. *Peckinpaugh v. State*, 447 N.E.2d 576, 581 (Ind. 1983). Here, the testimony of Medic Bradbury, Officer Geiger, and Detective Epps regarding her injuries provided such substantial evidence that allowed the jury to find that K.B.'s repudiated statement was, in fact, credible. *See id.*

[35] Finally, Chambless's incredible dubiosity argument is unavailing. Under the incredible dubiosity rule, a court will impinge on the jury's responsibility to judge the credibility of the witnesses only when it has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Moore v. State*, 27 N.E.3d at 755. This rule applies only when a witness contradicts herself in a single statement or while testifying; it does not apply to conflicts between multiple statements. *See Glenn v. State*, 884

N.E.2d 347, 356 (Ind. Ct. App. 2008), *trans. denied*; *see also Buckner v. State*, 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006). When a witness's trial testimony contradicts a statement she made before trial, it is the jury's province to decide which statement to believe. *Glenn*, 884 N.E.2d at 356. Discrepancies between pretrial statements and trial testimony go to the weight of testimony and credibility of the witness but do not render such testimony incredibly dubious. *Holeton v. State,* 853 N.E.2d 539, 542-43 (Ind. Ct. App. 2006). Thus, the incredible dubiosity doctrine does not apply here because the contradiction was between K.B.'s pre-trial statements and her trial testimony, not within her trial testimony itself. Accordingly, the State presented sufficient evidence for Chambless's convictions.

[36]    Affirmed.

Riley, J., and Robb, J., concur.