## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 07 2020, 10:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Allen Houx,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 7, 2020<br><br>Court of Appeals Case No.<br>19A-CR-1547<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Grant W. Hawkins, Judge<br><br>Trial Court Cause No.<br>49G05-1806-F1-20561 |

**Barteau, Senior Judge.**

# Statement of the Case

[1] Allen Houx appeals his conviction by jury of child molesting, a Level 1 felony.[1] We affirm.

# Issue

[2] Houx raises one issue, which we restate as: whether the trial court erred in allowing a witness to testify as to what another witness had told her.

# Facts and Procedural History

[3] Jose and Rose Vallejo lived in Indianapolis with their four children. In April 2018, they allowed Houx, who they knew as "Panama," to stay with them because the electricity had been shut off at his former residence. Tr. Vol. 2, pp. 124, 150. Edwin Sanchez, who was engaged to Rose's mother, also moved into the Vallejos' home. Houx and Sanchez slept in the basement.

[4] On the night of March 5, 2018, Rose was at home with Houx, Sanchez, and her children. Sanchez was asleep in the basement, and Rose needed to go pick up Jose. She asked Houx to be responsible for the children while she was gone, and he agreed. Rose left after nine p.m. At that time, all of the children were in their bedrooms.

---

[1] Ind. Code § 35-42-4-3 (2015).

[5] After Rose left, J.V. entered the living room, where Houx was watching television. As they watched television together, Houx suddenly grabbed J.V. and pulled her pants and underwear down to her ankles. He "licked" her "private" with his tongue, moving his tongue "up and down" as she fought him. Tr. Vol. 2, p. 139. J.V. eventually freed herself and ran to her mother's room, where she cried herself to sleep on the bed. At trial, she identified Houx when the State asked her to point out the person that had "licked her pee-pee." *Id.* at 141.

[6] When Rose and Jose returned home, Rose found J.V. in her bed, asleep. She noticed J.V.'s jeans were unfastened and had slid down "a little bit past her hip." *Id.* at 153. Rose went to sleep and did not disturb J.V.

[7] The next morning, between seven and eight a.m., J.V. woke up and left Rose's bedroom. Two to three minutes later, J.V. returned to Rose's bedroom and tugged on her shirt. She looked scared and "really worried." *Id.* at 155. J.V. had seen Houx and said that she needed to talk with Rose. Rose testified that J.V. told her that on the previous night, Houx had "forced her down, pushed her down and held her down and licked her pee-pee." *Id.* at 158.

[8] Next, Rose confronted Houx, and she told Jose what J.V. had said. Jose ordered Houx to leave the residence while Rose comforted J.V., who was "[s]cared, shaking violently, crying" and hiding behind Rose. *Id.* at 161. Rose had never seen J.V. react that way to Houx.

[9]     A police officer arrived at the house and spoke with Rose.  At 1 p.m. that same day, Rose took J.V. to the Child Advocacy Center for a forensic interview. Later that same day, Rose took J.V. to Riley Hospital, where Angela Bates, a forensic nurse, performed a pediatric sexual assault examination on J.V.

[10]    Bates asked J.V. to remove her clothes.  J.V. was still wearing the same underwear from the previous evening, and Bates collected the underwear. Next, Bates examined J.V. from head to toe, generating a "body map" diagram as part of the process.  *Id.* at 183.  She noted on the body map that J.V. had abrasions on her lower legs and redness on the left side of her labia.  Bates concluded the redness was not "hygiene related," because in her experience that kind of issue would be "more generalized" instead of in one specific location. *Id.* at 194.  J.V. told Bates that the red area was tender to the touch.

[11]    Later, the police took a buccal swab from Houx.  DNA testing of a sample taken from the inside crotch of J.V.'s underwear revealed characteristics that were consistent with characteristics in Houx's DNA profile.  The characteristics of Houx's profile are present in only 1 out of every 699 male individuals, including Houx's male relatives and male ancestors.  In March 2018, none of Houx's male relatives lived in Indianapolis.

[12]    On June 26, 2018, the State charged Houx with Level 1 felony child molesting. The court presided over a jury trial on May 13 and 14, 2019.  The jury determined Houx was guilty as charged.  The court subsequently imposed a sentence, and this appeal followed.

# Discussion and Decision

[13] Houx argues the trial court erred by allowing Rose to tell the jury what J.V. had told her, arguing that Rose's testimony on that point was impermissible hearsay. The State responds that the testimony was not barred by the rule against hearsay.

[14] The trial court has inherent discretionary power in the admission of evidence, and its decisions are reviewed for an abuse of that discretion. *Jones v. State*, 780 N.E.2d 373, 376 (Ind. 2002). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Cox v. State*, 774 N.E.2d 1025, 1026 (Ind. Ct. App. 2002). In determining the admissibility of evidence, the reviewing court will consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

[15] Hearsay is "a statement that . . . is not made by the declarant while testifying at the trial or hearing; and . . . is offered in evidence to prove the truth of the matter asserted." Ind. Evid. Rule 801(c). Hearsay evidence is inadmissible at trial except as otherwise provided by statute or the Indiana Rules of Evidence. Ind. Evid. Rule 802.

[16] One exception to the rule against hearsay permits the admission of an "excited utterance." Ind. Evid. Rule 803(2). An excited utterance is: "A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Id.* "The rationale behind admitting

excited utterances is that startling events and absence of opportunity for reflection vest the statements with reliability and reduce the likelihood of falsification." *Chambless v. State*, 119 N.E.3d 182, 189 (Ind. Ct. App. 2019), *trans. denied*.

[17] In order for a hearsay statement to be admitted as an excited utterance, three elements must be established: (1) a startling event has occurred; (2) a statement was made by a declarant while under the stress of excitement caused by the event; and (3) the statement relates to the event. *Boatner v. State*, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010). Houx disputes only the second element, claiming J.V. could not have been under the stress of excitement when she told Rose that Houx had molested her the previous evening.

[18] A startling event and the resulting utterance need not be contemporaneous, though lapse of time is a factor to consider when deciding if the statement was spontaneous and unrehearsed. *Chambless*, 119 N.E.3d at 189. The longer the time between an event and an utterance, the greater the likelihood that the statement is a narrative of past events instead of an excited utterance. *Id.* However, the greater the stress caused by the event, the longer the effects of the stress can endure. *Id.* "The heart of the inquiry is whether the declarant was incapable of thoughtful reflection." *Jones v. State*, 800 N.E.2d 624, 627 (Ind. Ct. App. 2003).

[19] The Court's decision in *Ramsey v. State*, 122 N.E.3d 1023 (Ind. Ct. App. 2019), *trans. denied*, provides guidance on the span of time that may elapse between a

startling event and an utterance. In that case, a victim was found in her residence, terrified and displaying injuries consistent with a severe beating. When the police arrived at the scene, the victim told an officer that Ramsey (who was absent from the residence) had held her against her will for four days and had threatened to harm her children. The victim appeared to be very upset, shaken, and nervous. Later, at the hospital, the victim told the same officer that Ramsey had beaten her repeatedly over a three-day span.

[20] Ramsey argued the trial court erred in allowing the officer to testify as to the victim's statements. A panel of this Court noted the officer spoke with the victim shortly after she had been rescued from her residence, and she displayed signs consistent with still being under the effects of a traumatic ordeal. The Court concluded the victim was still under the stress of excitement when she spoke with the officer, and as a result her statements qualified as excited utterances that were not subject to the rule against hearsay.

[21] Similarly, in *D.G.B. v. State*, 833 N.E.2d 519 (Ind. Ct. App. 2005), the parents of a six-year-old left her in the care of fifteen-year-old D.B.G. When they returned, they took D.G.B. and the victim to run an errand before returning home. An hour after they returned, the victim told her mother something was wrong. The mother discovered the victim was not wearing underwear and was bleeding profusely from her vagina. D.G.B. claimed the victim had been hurt during horseplay.

[22] The mother took the victim to the hospital, where doctors discovered the victim's vagina was torn, and the nature of the injury was inconsistent with D.G.B.'s account of how it had occurred. The victim underwent surgery and spent the night in the hospital. The next morning, the victim appeared to be upset while having breakfast and pushed her fork and knife to the side. When her mother asked what was wrong, the victim stated that while she had been left in D.G.B.'s care, D.G.B. and his friend had held her down and inserted a fork and knife into her vagina. She also said D.G.B. had threatened to roast her on a grill and feed her to a dog if she told anyone.

[23] The State alleged D.G.B. was a juvenile delinquent for acts that, if committed by an adult, would have included Class A felony child molesting. At trial, the victim's mother described the victim's statements to her. The juvenile court entered a true finding on the child molest allegation. On appeal, D.G.B. claimed the court should not have admitted the mother's testimony about the victim's statements because they were hearsay. A panel of this Court concluded that at the time the victim disclosed the abuse to her mother, the victim was still under the stress of the excitement caused by the sexual assault because: (1) she could not stop bleeding; (2) she was taken to the emergency room; (3) she was anesthetized and subjected to surgery without being sufficiently prepared; and (4) she was confronted at breakfast with the same type of implements that had injured her. The Court concluded, "We are convinced that a six-year-old child who suffered the abhorrent molestation that

F.N. suffered here would remain under the stress of excitement caused by this event for much longer than the adults [in a different case]." *Id.* at 527.

[24] In the current case, Houx was living in seven-year-old J.V.'s home and was temporarily in a position of supervision over her. He suddenly and violently assaulted J.V., pulling down her pants and underwear and placing his mouth on her genitals before she was able to break free and run to her mother's room, where she cried herself to sleep. Almost immediately upon awakening the next morning, she left the bedroom, encountered Houx again, and returned to tell her mother what Houx had done the night before. Rose noted that J.V. was "really worried and like scared." Tr. Vol. 2, p. 155. Soon thereafter, when Rose comforted J.V. as Jose ordered Houx to leave the apartment, J.V. was [s]cared, shaking violently, crying." *Id.* at 161.

[25] We conclude from the foregoing that J.V. was still under the stress of the excitement caused by Houx's sexual assault. Similar to the victim in *Ramsey*, J.V. was still in her own home, and her attacker was present or could have returned at any time. In addition, similar to the victim in *D.G.B.*, J.V. was confronted with a reminder of the assault (seeing Houx) immediately before disclosing to Rose what had happened. Further, J.V., like the victims in *Ramsey* and *D.G.B.*, displayed signs of emotional upset and fear as she told her mother what Houx had done to her. The trial court did not abuse its discretion by admitting Rose's testimony as an exited utterance.

[26] Even if the trial court had erred in admitting Rose's hearsay testimony, any error would have been harmless. Indiana Rule of Appellate Procedure 66(A) provides:

> No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

Thus, we will not reverse a trial court's evidentiary ruling if we may sustain it on any ground. *Chambless*, 119 N.E.3d at 188.

[27] During the trial, J.V. stated that Houx "licked" her "private" with his tongue, moving his tongue "up and down" as she fought with him. Tr. Vol. 2, p. 139. She also agreed that Houx was the person who had "licked her pee-pee." *Id.* at 141. In addition, the forensic nurse who had examined J.V. discovered leg abrasions that were consistent with J.V.'s description of struggling against Houx. The nurse also found a spot of redness on J.V.'s labia, which she deemed inconsistent with mere hygienic issues. Finally, DNA testing of Houx's sample and a sample generated from the interior crotch of J.V.'s underwear revealed that the samples had similar characteristics. Only one in 699 males have similar characteristics, including Houx's male relatives, and none of his male relatives lived in Indiana.

[28] Houx argues that J.V. made inconsistent statements as to where he licked her on her body and concludes there is a reasonable doubt as to whether he

molested her. This is a request to reweigh the evidence, which violates our standard of review. There is ample independent evidence to sustain Houx's conviction, and any error in the admission of Rose's testimony about what J.V. said to her was minor in impact and could not have affected Houx's substantial rights.

# Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

Riley, J., and Robb, J., concur.